[No. S057262. Jan. 15, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
SCOTT ALDEN WHITSON, Defendant and Appellant.

230

232

**COUNSEL**

Richard L. Schwartzberg, under appointment by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez, Janelle Marie Boustany and Karl T. Terp, Deputy Attorneys General, for Plaintiff and Respondent.

Michael R. Capizzi, District Attorney (Orange), Devallis Rutledge, Deputy District Attorney, Kent S. Scheidegger and Charles L. Hobson as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**GEORGE, C. J.**—In 1994, defendant Scott Alden Whitson was convicted of two counts of second degree murder, arising out of a collision in which the motor vehicle he was driving ran through a red light and crashed into another car at a speed estimated to be in excess of seventy-five miles per hour, killing the other driver as well as one of defendant's passengers. (Pen. Code, § 187, subd. (a).)[1] A divided Court of Appeal reversed the convictions, concluding that the trial court erred in admitting into evidence (1) defendant's pretrial statements to police officers, because the statements had been obtained in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (*Miranda*), and (2) evidence of defendant's poor driving record.

As we explain, we conclude the Court of Appeal erred in finding a violation of defendant's rights under *Miranda*, and further conclude that even if evidence of defendant's poor driving record erroneously was admitted at his trial, any error in this regard was not prejudicial. Accordingly, we reverse the judgment of the Court of Appeal.

---

[1]Unless otherwise specified, subsequent statutory references are to the Penal Code.

## I

## A

The prosecution's evidence at trial established that the crime arose out of the following facts. Shortly before midnight on June 11, 1993, Costa Mesa Police Department Motorcycle Officer Angelo Morgan observed a man running "full sprint" through the parking lot adjacent to a commercial building complex. When the officer made eye contact with the individual, Derick Romo, Romo abruptly changed direction and ran toward a Volkswagon Cabriolet (VW). The VW was backed into a parking space in a remote section of the parking lot, far from a fast-food restaurant—the only business open in that area at that late hour. Morgan observed Romo enter the VW, which immediately sped away, tires squealing and headlights off. Defendant was driving.

The VW entered the flow of traffic and sped through a red light at the intersection of Harbor and MacArthur Boulevards. After Morgan heard the sound of tires skidding (which he believed to be vehicles locking their brakes to avoid colliding with the VW), he activated his emergency lights and siren and pursued the VW. Morgan estimated the VW's speed to be 80 to 85 miles per hour.

As Morgan pursued the VW, defendant turned on the VW's headlights, maneuvered around two vehicles, then turned off the headlights. Morgan lost sight of the car as it entered the City of Fountain Valley. He turned off his motorcycle's lights and siren, sent a radio broadcast stating he had discontinued his pursuit, and began looking for the VW. Within a few minutes, a man on the sidewalk signaled the officer to report a serious accident at the nearby intersection of Ward and Slater Streets—located about two miles from the commercial parking lot where Morgan initially had observed the VW.

At the intersection mentioned, Morgan observed the scene of a "major injury accident" crash between the VW and an Acura sedan. An accident reconstruction expert estimated that the VW had hit the Acura at a 90-degree angle at a speed of approximately 77 miles per hour. (Lay witnesses estimated the VW's speed at 40-70 miles per hour.) There was no evidence indicating that either driver had braked or attempted to take evasive action, or that either vehicle had a mechanical problem that might have contributed to the collision. A pedestrian believed the driver of the VW had adequate time in which to stop prior to the collision, and testified that the VW·was at least one and one-half blocks from the intersection of Ward and Slater Streets when the traffic light changed to red.

Janice Diehm, the driver of the Acura, was killed. She bled to death as a result of blunt force trauma to her head and torso, the impact of the collision having fractured her neck, ribs, and pelvis. One of defendant's passengers, Romo, also bled to death, due to lacerations of the cerebrum, aorta, liver, and spleen; he also had suffered a fractured skull.[2]

An emergency medical technician found a metal "window punch" in defendant's sock. The punch can be used to break into vehicles. There was no evidence that defendant was under the influence of drugs or alcohol at the time of the collision.

Defendant was charged by information with having committed two counts of murder, arising from the deaths of Janice Diehm and Derick Romo, but not charged with having committed any offenses stemming from the injuries sustained by Royola Richards or Zacharia Antolin.

Over defense objection (based on *Miranda*), the prosecution introduced incriminating statements made by defendant to police officers in the course of three interviews conducted on the days immediately following the collision. This evidence, which revealed inconsistencies in defendant's version of relevant events and indicated defendant was aware of the risk that his driving posed to others, is more fully summarized in the discussion that follows (*post*, pp. 237-240).

Over defense objection, the prosecution also introduced evidence pertaining to defendant's driving record, establishing that defendant (1) attended traffic school in September 1990, (2) was involved in a traffic accident in October 1990 (for which police officers determined he was at fault for failing to yield the right of way), (3) received a citation for driving at an excessive speed in November 1990, and (4) was cited for failing to obey a posted sign in February 1992.

In response to the prosecution's case, the defense sought to establish that defendant was guilty of vehicular manslaughter, not murder. Toward this end, the defense presented a number of witnesses to establish that defendant was an individual of exceedingly limited mental capabilities who had difficulty functioning in stressful conditions, and thus could not have harbored

---

[2]Defendant's other passenger, Zacharia Antolin, suffered traumatic brain injury, hemorrhage, and various fractures. Defendant suffered a fractured pelvis and a cut on his forehead that required stitches. The comparatively minor nature of defendant's injuries was attributed to the operation of the driver's-side airbag in the VW.

Janice Diehm's passenger, Royola Richards, was brought to a hospital in a coma. She was found to have multiple system trauma with massive head injuries, skull fractures, and extremity fractures. She was hospitalized for several weeks, and thereafter was placed in a rehabilitation program for several months.

the "conscious disregard for human life" necessary to support a verdict of second degree murder based upon a theory of implied malice. (See, generally, *People* v. *Nieto Benitez* (1992) 4 Cal.4th 91, 102-104 [13 Cal.Rptr.2d 864, 840 P.2d 969]; *People* v. *Protopappas* (1988) 201 Cal.App.3d 152, 168 [246 Cal.Rptr. 915].)

Defendant was described by a psychologist retained by the defense as being "borderline retarded," based upon defendant's consistently poor performance on intelligence tests, in which he scored below the fifth percentile. Because of his mental limitations, defendant had been enrolled in special education classes since the third grade. By the 12th grade, defendant had a 6th grade reading level, and his spelling and mathematics capabilities were below that. He suffered from an attention-deficit problem that made it difficult for him to focus and organize his thoughts. He made four attempts to pass the driver's test before obtaining his driver's license. The defense psychologist opined that defendant did not think rationally or consistently, although on cross-examination the psychologist acknowledged that defendant was not incapable of fabricating a story to the police when that would serve his purpose.

Defendant's stepfather testified that when he and his wife visited defendant at the hospital at approximately 4:10 a.m. on June 12, 1993, a nurse was sewing the laceration on defendant's forehead, and defendant was covered with blood, was drifting in and out of consciousness, and did not immediately recognize them.

Defendant did not testify.

The prosecution did not offer any evidence in rebuttal.

After hearing the evidence and deliberating, the jury returned a verdict finding defendant guilty of two counts of second degree murder.

## B

At a pretrial hearing, defendant moved to suppress statements that he made to investigating police officers at the hospital on three separate occasions shortly after the collision, and also moved to suppress evidence of his poor driving record. With regard to the pretrial statements to the officers, defendant contended that at no time during those interviews did he knowingly, intelligently, and voluntarily waive his right to an attorney, and that therefore his statements were inadmissible under the principles set forth in *Miranda.* He also objected to the prosecution's intended introduction of

evidence of his poor driving record on the grounds that such evidence was irrelevant and, if relevant, was unduly prejudicial. (See Evid. Code, §§ 210, 352.)

In response to defendant's motion, the prosecutor called two witnesses to establish that defendant understood and validly waived his rights under *Miranda*. Defendant thereafter called three witnesses. The pretrial testimony of these five witnesses is summarized below.

The first prosecution witness, Tustin Police Officer Joseph Thornton, testified that on December 26, 1992, approximately six months prior to the occurrence of the collision in the present case, he responded to a request for police assistance (in connection with an alleged shoplifting incident) at a Mervyn's store located in the City of Tustin. When Thornton arrived at the Mervyn's security office, he encountered defendant and interviewed him. Prior to the interview, Thornton advised defendant of his rights under *Miranda*. Thornton testified that defendant did not appear confused by any of the questions posed to him during the officer's reading of the *Miranda* advisements, that defendant affirmatively responded that he understood each of his rights as they were read to him, and that defendant thereafter expressed his willingness to be interviewed by the police.[3]

The prosecution's second witness, Fountain Valley Police Officer Christopher Andrews, testified that he interviewed defendant at approximately 2:45 a.m. on June 12, 1993, about three hours after the VW driven by defendant collided with the Acura. Andrews conducted the interview in the emergency room of the University of California at Irvine Medical Center. Two other officers were present. Andrews testified that he advised defendant of his rights under *Miranda*, adding, "You understand you don't have to talk to me if you don't want to." Andrews did not request an "express" waiver of defendant's rights under *Miranda*, but instead asked whether defendant "understood" the rights. According to Andrews, defendant responded in a "normal" and "clear" voice that he understood his *Miranda* rights, after which Andrews began to question defendant. At no time did defendant request the presence of an attorney or indicate a desire not to speak with the officer.

Andrews testified that his interview with defendant lasted approximately 10 minutes, during which time defendant explained that just prior to the collision, he was driving "Derick [Romo]'s" vehicle with 2 friends, and that for some unknown reason they were chased by a Hispanic male, approximately 25 years of age, driving a red Cadillac. After the officer informed

---

[3]At oral argument before this court, counsel for defendant conceded that defendant had waived his *Miranda* rights in connection with the alleged shoplifting incident.

defendant that he disbelieved defendant's story, defendant agreed to "cut out the bullshit." He thereafter told the officer that after parking the VW, Romo had left the vehicle to steal a car stereo. At some point, Romo returned, exclaiming, "Let's go. Let's get out of here." Defendant drove away, and someone on a motorcycle began to chase the vehicle. Defendant tried to elude the motorcycle, not knowing the driver was a police officer, and denied hearing the motorcycle's siren or seeing its red and blue lights. Defendant believed he was traveling approximately 60 miles per hour. He was unsure whether he had run any red lights, but admitted that he might have done so. He acknowledged that it was a "stupid" thing to try to steal the stereo. Andrews testified that during the interview, defendant did not say anything—or make any sounds—indicating he was in considerable pain. The interview was not tape-recorded.

The second interview also took place in the hospital, at approximately 7:50 p.m. on the same day, and was conducted by Fountain Valley Police Sergeant Larry Griswold, who was accompanied by Officer Andrews and a sheriff's deputy. According to Andrews, Griswold readvised defendant of his rights under *Miranda* and asked defendant whether he understood them. Defendant responded affirmatively and did not request an attorney or appear confused. During the interview, which lasted approximately 30 minutes, defendant reiterated the version of events he had given previously, adding that he was "[s]cared of the guy chasing me [on the motorcycle]." Defendant also acknowledged that approximately five seconds before the collision, he feared that the VW might crash. He again denied being aware that a law enforcement officer was driving the motorcycle, adding that he would have pulled over had he known. Defendant's answers were "normal, clear and loud," and he did not appear to be in any pain (except at one point when Griswold inadvertently bumped into defendant's bed).

Although Griswold and Andrews each possessed concealed tape recorders during the second interview of defendant, Griswold's malfunctioned and Andrews's tape contained many gaps—including a gap at the point when defendant was advised under *Miranda*. According to Andrews, the gaps were the result of his having hidden the tape recorder inside a pocket of his jeans; he testified that when he moved about the room, he inadvertently switched the "pause" button on and off.

The third interview took place at the hospital, at approximately 2:00 p.m., on June 21, 1993, nine days after the collision. Andrews, again accompanied by Griswold and a sheriff's deputy, readvised defendant of his *Miranda* rights and asked him whether he understood those rights. It is undisputed that defendant responded affirmatively. Andrews then asked, "OK, and

having your rights in mind do you want to answer a few questions for me?" It is undisputed that defendant again responded affirmatively.

During the interview, the officers asked defendant to reiterate his version of the relevant events. Defendant replied that Romo had left the VW, then returned to the vehicle "like Speedy Gonzalez," telling defendant, "Let's go, let's get out of here." Defendant drove through the intersection of Harbor and MacArthur Boulevards, believing the light to be green. Defendant acknowledged that a motorcycle chased him, but stated that during the pursuit he believed the driver of the motorcycle intended to shoot at the VW. When asked, "Did you realize it was kind of dangerous?," defendant replied, "Yes, I did." The following colloquy then ensued:

"Officer: What do you think made you keep going?

"Defendant: Being egged on.

"Officer: OK, I think so too. But you have to tell me about that 'cause I wasn't in the car.

"Defendant: Derick's going 'Fuckin' go, fuckin' go man!'

"Officer: Just Derick? You knew how dangerous it was, but your friend is just making you keep going? . . . Why? Tell me . . . what was so strong about him about telling you to keep going?

"Defendant: Just the tone of his voice.

"Officer: How scared were you?

"Defendant: I shit my pants.

"Officer: Because . . . .

"Defendant: . . . afraid I'm going to kill someone or hurt someone else . . . ."

When asked about the Cadillac that he had described in the first interview, defendant admitted there had been no Cadillac. Andrews testified defendant's answers were responsive, "clear and loud," and that except for one point in the interview, defendant did not appear to be in any considerable pain. The interview was tape-recorded by Griswold and Andrews.

The parties stipulated that (1) a blood sample taken from defendant at approximately 5:00 a.m., June 12, 1993, was analyzed and determined to be

negative for alcohol and drugs, and (2) defendant possessed a California driver's license at the time of the collision.

The prosecution contended it was entitled to introduce evidence pertaining to defendant's driving record. This evidence established that defendant (1) had attended traffic school in September 1990, (2) was involved in a traffic accident in October 1990, for which he was found by police officers to have been the party at fault for failing to yield the right of way, (3) received a citation for driving with excessive speed in November 1990, and (4) was cited for failing to obey a posted sign in February 1992. The prosecution urged that such evidence tended to establish defendant's "subjective awareness of the rules of the road and the dangers involved."

In response to the prosecution's arguments at the pretrial hearing, the defense introduced the testimony of defendant's stepfather, Ronald Wahl, who stated that he and defendant's mother arrived at the hospital at approximately 4:10 a.m. on June 12, 1993 (more than one hour after defendant's initial interview with Officer Andrews). Wahl testified that defendant was "drifting in and out" and took several minutes to recognize Wahl. At the time, a nurse was sewing the cut on defendant's forehead, and, according to Wahl, defendant "had blood all over him." Defendant's voice was neither loud nor clear, and his answers were nonresponsive. Wahl testified that his stepson told him he was in pain, and that "you could see that he was in pain."

The defense also introduced the testimony of Arnold Purisch, a clinical psychologist, who interviewed defendant in December 1993 and February 1994. He characterized defendant "as having anywhere between a mentally retarded to borderline intelligence."

Finally, the defense introduced the testimony of Gianna Scannell, a surgeon who examined defendant shortly after he arrived at the hospital following the collision. Scannell testified that defendant stated at that time that he did not remember the collision.

As noted, defendant sought to suppress his pretrial statements on the basis that he had not knowingly, intelligently, and voluntarily waived his rights under *Miranda.* He contended that during his initial interview with police officers after the collision, he was incapable of making a free or rational choice due to his injuries and because he was "functionally retarded." During subsequent interviews with the police, he was in pain and had been administered various prescription drugs. Defendant's position was that the "totality of the circumstances" (see *In re Cameron* (1968) 68 Cal.2d 487, 498

[67 Cal.Rptr. 529, 439 P.2d 633]) weighed against the admissibility of his pretrial statements.

The trial court found that with regard to each of defendant's three pretrial statements, the prosecution had presented uncontradicted testimony that law enforcement officers had advised defendant of his rights under *Miranda.* Accordingly, the court found that defendant had been so advised. Turning to the question whether defendant had waived his *Miranda* rights, the court opined: "I think the law is such that you do not have to expressly ask for a waiver, if from all the facts, it appears that the defendant was aware of his *Miranda* rights and then started responding to questions where there's no coercion or duress." Finally, the trial court rejected defendant's argument that his low intelligence, the pain and trauma from the collision, and defendant's medicated condition at various points during his hospital stay combined to establish that his waiver of his *Miranda* rights was not knowing or intelligent. Rather, based upon the totality of the circumstances, the court found that "defendant was . . . well in control of his faculties and responsive to the questions," and that the waiver was valid. Accordingly, the court ruled that the statements were admissible.

The trial court further found that the evidence of defendant's poor driving record was relevant (Evid. Code, § 210), not unduly prejudicial (Evid. Code, § 352), and therefore admissible.

C

At trial, Officer Andrews and Sergeant Griswold testified for the prosecution in a manner consistent with the version of the events offered by Andrews at the pretrial hearing. Officer Andrews testified that he recited the *Miranda* advisements to defendant during their first interview after the accident, and that defendant appeared to be alert and responsive to questions. Sergeant Griswold testified similarly regarding defendant's apparent comprehension of the *Miranda* advisements given to him during the second and third interviews, and defendant's willingness to answer the officers' questions. Griswold also recounted defendant's inconsistent versions of relevant events. The prosecution played the tapes of the second and third interviews, and the jury was provided transcripts of those tapes.

The prosecution also introduced the evidence of defendant's poor driving record that had been considered at the pretrial hearing.

The testimony of defendant's mother established his learning difficulties. His stepfather testified regarding defendant's semiconscious condition in the

hospital at approximately 4:10 a.m. on June 12, 1993, and (on cross-examination) regarding defendant's general reluctance to operate a motor vehicle at unsafe speeds. Defendant's high school special education teacher testified regarding defendant's "attention deficit syndrome" and poor academic performance in school. On cross-examination, the teacher stated his belief that defendant was "possibly borderline retarded." A psychologist testified that defendant experienced difficulty in organizing his thoughts and functioning under stressful situations but that defendant was not so mentally limited as to be unable to lie or fabricate a story.

The jury was instructed with a panoply of standard and special instructions, none of which are challenged here. On the second day of deliberations, the jury found defendant guilty of having committed the second degree murders of Janice Diehm and Derick Romo.

## D

Following defendant's convictions, he appealed, contending that the trial court committed reversible error in admitting his pretrial statements to the police officers and in admitting evidence of his poor driving record.

The Court of Appeal majority agreed with defendant's position on the *Miranda* issue, holding that "a combination of factors convinces us *this defendant* did not waive his *Miranda* rights when he spoke to police. . . . The failure to get an express waiver in this case is one factor that convinces us defendant did not effectively waive his rights. [¶] The most important circumstance here is, of course, defendant's mental impairment and physical condition at the time of his interviews. The evidence on [this] point was essentially undisputed: Defendant is borderline retarded and incapable of making decisions in stressful situations. . . . At the time of each interview, this mentally impaired defendant, who was severely injured (and must have been in pain or drugged or both) was in a room alone with three other officers, where he was interrogated. We cannot conclude *this* defendant made a competent or rational 'decision' to waive his rights under these stressful conditions. . . . [¶] Moreover, defendant was not criminally sophisticated . . . . [¶] . . . . Defendant's statements provided important evidence of his state of mind (subjective appreciation of the risk) at the time of the crash. Reversal is required." (Original italics.)

With regard to the admission of evidence of defendant's poor driving record, the Court of Appeal reasoned: "Evidence defendant had previously been convicted of speeding and failing to yield or obey a posted sign, without anything additional showing similarity between the previous and

present offenses, did not tend to prove defendant knew his conduct endangered life. There was, for example, no evidence defendant had caused or threatened injury to anyone in the prior incidents. It cannot be rationally argued that everyone who speeds or violates a posted sign necessarily appreciates his conduct threatens human life under all circumstances. [¶] . . . [¶] . . . [N]othing here reflects intention, as opposed to inattention. Admission of this evidence was error and not harmless. The evidence suggested defendant was an unsafe or negligent driver, more culpable than one with a flawless driving record, and thus encouraged a leap from manslaughter to murder. With no evidence defendant's prior conduct was in any way similar to his present misconduct, such a leap was illogical, unwarranted, and undoubtedly prejudicial. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)"

Writing in dissent, Justice Sonenshine observed that her colleagues had assumed the role of "an extraordinary trier of fact" in reversing the trial court's ruling that defendant validly had waived his rights under *Miranda*. Justice Sonenshine opined that it was for the trial court to determine whether defendant was unable to knowingly and intelligently waive his *Miranda* rights, adding: "Indeed, the evidence was conflicting as to Whitson's intellectual capabilities (he was smart enough to pass his driver's test and sophisticated enough to fabricate events to police). I would remand the matter to the trial court for it to reconcile the facts and decide whether Whitson was capable of rendering a knowing and intelligent waiver.

"I would also uphold the admission of Whitson's prior citations for speeding and failing to yield. Although the majority claims there is 'no evidence defendant's prior conduct was in any way similar to his present misconduct,' the facts clearly reveal Whitson speeded and failed to yield before broadsiding Diehm's car. My colleagues also overlook the citations were not used to prove a common plan or identity, which require a high degree of similarity between the uncharged act and the charged offense, but to show Whitson's intent, which requires '[t]he least degree of similarity[.]' (*People* v. *Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757].)

"As for the prejudicial effect of the evidence, there was little risk the jury would be inclined to punish Whitson for the driving violations, because he had already been cited for the infractions. (See *People* v. *Ewoldt, supra,* 7 Cal.4th at p. 405.) Moreover, the citations were not unduly remote or anywhere near as inflammatory as the testimony concerning the charged offenses. (*Ibid.*) Thus, there was no abuse of discretion in admitting evidence of Whitson's past driving record."

## II

█ In reviewing the judgment rendered by the Court of Appeal, we begin with the question whether the trial court erred in admitting evidence of defendant's pretrial statements made to police officers during the three interviews conducted after the collision. In analyzing this issue, we consider whether defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights.[4]

█ In *Miranda, supra,* 384 U.S. 436, the United States Supreme Court addressed the admissibility of statements obtained from an individual who is subjected to custodial police interrogation, and set forth certain procedures to assure that the individual is accorded his privilege under the Fifth Amendment to the federal Constitution not to be compelled to incriminate himself. The high court held: "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. █ *After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.* But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." (384 U.S. at pp. 478-479 [86 S.Ct. at p. 1630], italics added, fn. omitted.) The high court in *Miranda* also held that "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or

---

[4]As we explain, a waiver may be express or implied; the People contend that both forms of waiver are found in the present case. Because the People failed to properly preserve the express waiver issue, however (raising it for the first time in a petition for rehearing filed in the Court of Appeal), we need not and do not address it. (*People* v. *Crowson* (1983) 33 Cal.3d 623, 628 [190 Cal.Rptr. 165, 660 P.2d 389].) Our analysis instead will focus on whether defendant impliedly waived his *Miranda* rights.

simply from the fact that a confession was in fact eventually obtained." (*Id.* at p. 475 [86 S.Ct. at p. 1628].)[5]

In explaining the basis for its decision, the court in *Miranda* held: "For those unaware of the [right to remain silent], the warning is needed simply to make them aware of it—the threshold requirement for an intelligent decision as to its exercise." (384 U.S. at p. 468 [86 S.Ct. at p. 1624].) Likewise, the warning that anything said can and will be used against the individual "is needed in order to make him aware not only of the [Fifth Amendment] privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege." (*Id.* at p. 469 [86 S.Ct. at p. 1625]; see also *Colorado* v. *Spring* (1987) 479 U.S. 564, 574 [107 S.Ct. 851, 857-858, 93 L.Ed.2d 954] ["The *Miranda* warnings ensure that a waiver of [the Fifth Amendment privilege against self-incrimination] is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him."].)

▮ In the present case, the prosecution presented evidence that the investigating police officers advised defendant of his *Miranda* rights at each of the three interviews. On each one of these occasions, defendant affirmatively told the interviewing officers that he understood those rights. Defendant did not appear to be under the influence of drugs, and his answers were responsive to the questions asked of him. The defense offered no evidence to the contrary. The sole issue before us regarding the admissibility of the statements made by defendant in these interviews is whether the trial court properly found that defendant validly waived his rights under *Miranda*. To resolve this question, we are guided by well-established case law.

In *North Carolina* v. *Butler* (1979) 441 U.S. 369 [99 S.Ct. 1755, 60 L.Ed.2d 286] (*Butler*), the United States Supreme Court addressed the question whether an express waiver of *Miranda* rights invariably is required in order for there to be a valid waiver. In *Butler*, the prosecution produced evidence of incriminating statements made by the defendant to Federal

[5]The record is unclear as to exactly when defendant was placed under arrest. The People never have challenged defendant's assertion that the second and third interviews conducted by police officers while defendant was immobilized in the hospital were "custodial interrogations" for purposes of *Miranda*. As to the first interview, the People contend that defendant was not in custody. We need not address the People's contention, because the interviewing officers assumed defendant was entitled to be advised under *Miranda*, and the evidence was uncontroverted that, in fact, the officers so admonished defendant. (See *Duckworth* v. *Eagan* (1989) 492 U.S. 195, 203 [109 S.Ct. 2875, 2880, 106 L.Ed.2d 166]; *Oregon* v. *Mathiason* (1977) 429 U.S. 492, 495 [97 S.Ct. 711, 714, 50 L.Ed.2d 714].)

Bureau of Investigation agents shortly after his arrest. After advising the defendant of his *Miranda* rights, and determining that he had an 11th grade education and was literate, the agents provided him with an "Advice of Rights" form, which he read. When asked whether he understood his rights, defendant replied that he did. He refused to sign the form, however, instead declaring, "I will talk to you but I am not signing any form." He thereafter made inculpatory statements. At no time did the defendant request the presence of counsel or attempt to terminate the agents' questioning. The trial court denied the defendant's motion to suppress the statements, and defendant ultimately was found guilty of the charges against him, but the North Carolina Supreme Court reversed the judgment on the ground that the defendant's waiver had not been "specifically made" after the *Miranda* warnings were given. (441 U.S. at pp. 369-372 [99 S.Ct. at pp. 1755-1757].)

   ■   In reversing the judgment rendered by the North Carolina Supreme Court, the United States Supreme Court held in *Butler*: "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but it is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda*, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases *waiver can be clearly inferred from the actions and words of the person interrogated*." (441 U.S. at p. 373 [99 S.Ct. at p. 1757], italics added, fn. omitted.) The high court in *Butler* added that "the question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " (441 U.S. at pp. 374-375 [99 S.Ct. at p. 1758], quoting *Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 146 A.L.R. 357].)

   Shortly after its decision in *Butler*, the United States Supreme Court in *Fare* v. *Michael C.* (1979) 442 U.S. 707 [99 S.Ct. 2560, 61 L.Ed.2d 197] (*Fare*) again discussed the proper method of analyzing whether a valid waiver of *Miranda* rights has occurred. *Fare* involved a juvenile's request, made while undergoing custodial interrogation, to see his probation officer. In reversing a judgment rendered by this court (which had concluded that the defendant's request represented a per se invocation of his Fifth Amendment rights as set forth in *Miranda*), the court held: "[T]he determination whether

statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel. [Citation.] [¶] This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver . . . . The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation." (442 U.S. at pp. 724-725 [99 S.Ct. at pp. 2571-2572].) In following this approach, the court in *Fare* concluded there was "no indication that [the defendant] was of insufficient intelligence to understand the rights he was waiving, or what the consequences of that waiver would be." (442 U.S. at p. 726 [99 S.Ct. at p. 2572].)

■ In *Moran* v. *Burbine* (1986) 475 U.S. 412 [106 S.Ct. 1135, 89 L.Ed.2d 410] (*Moran*), a case involving the defendant's execution of a written form acknowledging his right to the presence of an attorney and explicitly declining counsel before giving a statement to the police, the United States Supreme Court made clear that in order to determine whether a defendant voluntarily, knowingly, and intelligently has waived his *Miranda* rights, a court analyzing the question must consider two distinct components: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citations.] [¶] . . . [¶] . . . Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." (475 U.S. at pp. 421, 422-423 [106 S.Ct. at p. 1141], fn. omitted.)

California law involving the implied waiver of a defendant's *Miranda* rights is in accord with the federal case authorities cited above. (See *People* v. *Medina* (1995) 11 Cal.4th 694, 752 [47 Cal.Rptr.2d 165, 906 P.2d 2]; see also *People* v. *Sully* (1991) 53 Cal.3d 1195, 1233 [283 Cal.Rptr. 144, 812 P.2d 163] [the defendant impliedly waived his *Miranda* rights when, after having been admonished of those rights, he responded affirmatively that he understood them and gave a tape-recorded statement to a detective]; *People* v. *Davis* (1981) 29 Cal.3d 814, 823-826 [176 Cal.Rptr. 521, 633 P.2d 186]

[implied waiver upheld where the defendant, a 16-year-old minor, was advised of his *Miranda* rights and responded that he understood them, and thereafter made statements to investigating police officers that led to his arrest]; *People v. Johnson* (1969) 70 Cal.2d 541, 558 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366], disapproved on another point in *People v. DeVaughn* (1977) 18 Cal.3d 889, 899, fn. 8 [135 Cal.Rptr. 786, 558 P.2d 872] ["Once the defendant has been informed of his [*Miranda*] rights, and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows of his rights and chooses not to exercise them."]; *People v. Nitschmann* (1995) 35 Cal.App.4th 677, 680-683 [41 Cal.Rptr.2d 325] [upholding a finding of an implied waiver where no evidence was presented that the defendant was confused, misled, or reluctant to speak about the incident].)

As noted, in this case the trial court, after hearing the testimony of witnesses called by both parties, found that defendant voluntarily and knowingly had waived his *Miranda* rights. ■ In *People v. Wash* (1993) 6 Cal.4th 215, 235-236 [24 Cal.Rptr.2d 421, 861 P.2d 1107], we discussed the proper role of an appellate court in reviewing such a trial court ruling: "In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under *Miranda v. Arizona, supra*, 384 U.S. 436, we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence. (*People v. Kelly* (1990) 51 Cal.3d 931, 947 [275 Cal.Rptr. 160, 800 P.2d 516].) Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained (*ibid.*), we ' "give great weight to the considered conclusions" of a lower court that has previously reviewed the same evidence.' (*People v. Jennings* (1988) 46 Cal.3d 963, 979 [251 Cal.Rptr. 278, 760 P.2d 475], quoting *Miller v. Fenton* (1985) 474 U.S. 104, 112 [106 S.Ct. 445, 88 L.Ed.2d 405, 412]; accord, *People v. Kelly, supra*, 51 Cal.3d at p. 947.) Because the crimes in this case occurred after the addition of section 28, subdivision (d) to article I of the California Constitution, the voluntariness of defendant's waiver and confession must be established by a preponderance of the evidence. (*People v. Markham* (1989) 49 Cal.3d 63 [260 Cal.Rptr. 273, 775 P.2d 1042].)" (*People v. Wash, supra*, 6 Cal.4th 215, 235-236; see also *Colorado v. Connelly* (1986) 479 U.S. 157, 168 [107 S.Ct. 515, 522, 93 L.Ed.2d 473] ["[T]he State need prove waiver only by a preponderance of the evidence."].)

■ With these principles in mind, we consider the evidence and the trial court's ruling in this case. On the question of the voluntariness of the waiver, the record is devoid of any suggestion that the police resorted to

physical or psychological pressure to elicit statements from defendant. To the contrary, defendant's willingness to speak with the officers is readily apparent from his responses. He was not worn down by improper interrogation tactics, lengthy questioning, or trickery or deceit. (See generally, *Moran, supra,* 475 U.S. at pp. 421-424 [106 S.Ct. at pp. 1140-1142]; *People* v. *Samayoa* (1997) 15 Cal.4th 795, 828-831 [64 Cal.Rptr.2d 400, 938 P.2d 2] [defendant's comment to police that he did not want his statement tape-recorded held to be insufficient to support his motion that statement was involuntarily made].) He was not induced to provide his statements by improper promises. The voluntariness of the waiver therefore is clear. (See *Colorado* v. *Connelly, supra,* 479 U.S. at p. 164 [107 S.Ct. at p. 520] ["Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." (Fn. omitted.)]; *Fare, supra,* 442 U.S. at pp. 726-727 [99 S.Ct. at pp. 2572-2573]; *Moran, supra,* 475 U.S. at pp. 421-422 [106 S.Ct. at pp. 1140-1141].)

We next turn to the second component of the analysis, which focuses on whether defendant was aware of the rights he was abandoning and of the consequences of his decision to do so. Although defendant was seriously injured in the collision, there was no direct evidence that *during* any of his interviews with the police, his judgment was clouded or otherwise impaired by pain, medications, or surgical procedures. The police officers testified, without contradiction, that defendant's answers were clear and responsive. The tape recordings and transcripts of the second and third interviews support this view. Although the defense presented evidence that raised questions regarding defendant's condition when he first was questioned by the officers at 2:45 a.m.—the testimony of a physician that, shortly after arriving at the hospital, defendant informed the physician that he (defendant) was unable to remember the accident, and the testimony of defendant's stepfather describing him as disoriented and barely conscious when they visited him at approximately 4:10 a.m. that morning—on this record the trial court properly could find, on the basis of the evidence presented by the prosecution, that, at each interview, defendant was aware of his rights and knowingly waived them.

Although defendant possessed relatively low intelligence, he was sufficiently intelligent to pass a driver's test, and to attempt to deceive officers by claiming initially that he was chased not by a motorcyclist, but by someone driving a Cadillac. He acknowledged the stupidity of Romo's plan to steal a car stereo. After being advised of his *Miranda* rights at the outset of each interview, defendant affirmatively indicated that he understood these rights (of which he had been advised during another encounter with the police

approximately half a year earlier). As was true with regard to the defendant in *Fare, supra,* 442 U.S. 707, 726 [99 S.Ct. 2560, 2572], there was no evidence that defendant in the present case lacked sufficient intelligence to understand those rights or the consequences of his waiver. In addition to reading defendant the *Miranda* advisements before interviewing him for the first time, Officer Andrews added, "You understand you don't have to talk to me if you don't want to." At no time did defendant request the presence of an attorney, or indicate that he wished to terminate the questioning.

In light of the foregoing evidence, we conclude that the record before us amply supports the trial court's ruling. Although the police officers did not obtain an *express* waiver of defendant's *Miranda* rights, decisions of the United States Supreme Court and of this court have held that such an express waiver is not required where a defendant's actions make clear that a waiver is intended. (See, e.g., *Butler, supra,* 441 U.S. 369, 374-375 [99 S.Ct. 1755, 1758-1759]; *People* v. *Medina, supra,* 11 Cal.4th 694, 752; *People* v. *Johnson, supra,* 70 Cal.2d 541, 556-558.) In *Davis* v. *United States* (1994) 512 U.S. 452, 460-461 [114 S.Ct. 2350, 2356, 129 L.Ed.2d 362], the high court held: "A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although *Edwards* [v. *Arizona* (1981) 451 U.S. 477 [101 S.Ct. 1880, 68 L.Ed.2d 378]] provides an additional protection—if a suspect subsequently requests an attorney, questioning must cease—it is one that must be affirmatively invoked by the suspect." (See also *Terrovona* v. *Kincheloe* (9th Cir. 1990) 912 F.2d 1176, 1180 [where the defendant gave detectives no indication that he wished to remain silent, instead offering an alibi, an implied waiver of his *Miranda* rights was held to be valid].) Our independent review of the evidence, including the tapes and transcripts of the interrogations introduced at trial (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 969-970 [2 Cal.Rptr.2d 112, 820 P.2d 214]), leads us to conclude that the trial court's ruling was sound and that defendant voluntarily and knowingly waived his Fifth Amendment rights. In finding otherwise, the Court of Appeal erred.

### III

■ As noted, in addition to concluding that the trial court erred in admitting defendant's pretrial statements, the Court of Appeal concluded that the trial court also erred in admitting evidence of defendant's poor driving record and of his attendance at traffic school. The Court of Appeal further held that the erroneous admission of this evidence was prejudicial. The People take issue with the Court of Appeal's conclusions, maintaining that the evidence properly was admitted and, in any event, was not prejudicial. As we shall explain, we need not determine whether the evidence

relating to defendant's driving record and attendance at traffic school properly was admitted, because even if we were to assume the trial court erred in allowing the prosecution to introduce such evidence, any error could not have been prejudicial under the applicable standard. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Under *Watson*, the erroneous admission of evidence of defendant's driving record and attendance at traffic school would constitute reversible error only if a reasonable probability exists that the jury would have reached a different result had this evidence been excluded. (See *People* v. *Watson, supra*, 46 Cal. 2d 818, 836; *People* v. *Scheid* (1997) 16 Cal.4th 1, 21 [65 Cal.Rptr.2d 348, 939 P.2d 748].) In the present case, the prosecution introduced the evidence relating to defendant's poor driving record and attendance at traffic school in order to support its claim that, at the time of the collision, defendant subjectively was aware of the serious risk of death posed by his reckless driving. Even without the evidence of defendant's poor driving record, however, there was strong evidence establishing that defendant was aware of the serious risks from his dangerous driving—including, most significantly, his explicit admission, in one of his pretrial statements to the police, that he realized that his driving on the night in question was dangerous and that while driving he was "afraid I'm going to kill someone or hurt someone else."

In addition to the foregoing express admission by defendant of his awareness of the danger to life posed by his driving, the evidence before the jury concerning the circumstances leading up to the collision strongly supports a finding of such awareness. As we have seen, the evidence indicates that in an attempt to evade a pursuing police officer, defendant sped through one red light causing other vehicles to screech to a halt to avoid a collision, drove at excessive speed with his vehicle's headlights off (briefly turning the lights on to maneuver around vehicles in front of him), and finally entered the intersection where the collision occurred against a red light and at a grossly excessive speed—broadsiding another vehicle.

Although the Court of Appeal suggested that "nothing here reflects intention, as opposed to inattention," in our view the evidence related above, particularly defendant's admission that while driving he was "afraid [he was] going to kill someone or hurt someone else," makes it clear there is no reasonable probability the jury's verdict would have been different even if the evidence of defendant's driving record or attendance at traffic school had been excluded. Accordingly, we conclude that the Court of Appeal erred in finding that any error in admitting this evidence was prejudicial.

## IV

For the reasons discussed above, the judgment of the Court of Appeal is reversed.

Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.