Filed 3/28/13  P. v. Lopez CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054132 |
| v. | (Super.Ct.No. RIF149879) |
| VICTOR LOPEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Graham Anderson Cribbs, Judge.  Affirmed.

Ellise R. Nicholson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Alana Cohen Butler and James D. Dutton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Victor Lopez guilty of receiving stolen property. (Pen. Code, § 496, subd. (a).) Defendant was thereafter sentenced to two years in state prison with credit for time served. On appeal, defendant contends that the trial court erred in denying his motion to suppress his in-custody statements to the police in violation of his *Miranda*[1] rights. We reject this contention and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On November 5, 2008, around 1:45 p.m., when the victim returned to her home, she discovered her home had been ransacked and burglarized. Among other items, all of her jewelry that was in her master bedroom had been stolen, including a diamond horseshoe gold nugget ring valued at $3,000. The ring was later located about 11 miles from her home at a coin shop.

The owner of the coin shop buys coins, jewelry, and other items for resale. When he purchases an item from an individual, he verifies the seller's photo identification and fills out a California Department of Justice mandated form. The form contains the seller's driver's license number, thumbprint, height, weight, date of birth, and address, as well as an itemization of the personal property sold to the business.

On November 7, 2008, defendant sold seven pieces of jewelry, including the stolen horseshoe gold ring, to the coin shop owner for a total price of $202. The price was derived from the total weight in gold of the seven items. A sheriff's department fingerprint technician testified that defendant's known fingerprint card, which was on file

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2

with the state's fingerprint database (the CAL-ID system), matched the thumbprint on the coin shop transaction form.

On November 18, 2008, Sergeant Mooney was contacted by the coin shop owner about the stolen gold ring. Sergeant Mooney went to the coin shop, reviewed and photographed the ring, and spoke with the victim and the coin shop owner. After obtaining defendant's address, the sergeant went to defendant's address, but defendant was not there.

On November 26, 2008, Sergeant Mooney and his partner located defendant and conducted a taped interview.[2] Defendant denied any involvement in the burglary of the residence, but admitted buying the horseshoe ring for $30 from a guy across the street from the coin shop and then selling it along with his own jewelry because he needed money. He initially said that he did not know about the burglary and did not think the ring was stolen. Later, defendant admitted that he knew the ring was real gold, and asserted that he thought maybe the ring was stolen. Defendant then stated, "Yeah, yeah, yeah, it was stolen, but I'm saying it didn't fit me, either."

## DISCUSSION

During trial, defendant requested a foundation hearing as to the introduction of his statements to Sergeant Mooney, claiming a *Miranda* violation. After the jury was excused, Sergeant Mooney testified that prior to interviewing defendant, he read

---

[2] The taped interview was played for the jury, and a transcription of the interview was admitted into evidence.

defendant his *Miranda* rights from a card; and that defendant had agreed to speak with him.  The following colloquy occurred between defendant and Sergeant Mooney:

"MOONEY:  Having these rights in mind, do you, will you talk to me and answer some questions I have —

"[DEFENDANT]:  Well —

"MOONEY:  — of you?

"[DEFENDANT]:  No.

"MOONEY:  You don't want to talk to me?

"[DEFENDANT]:  No, uh, what did you say?

"MOONEY:  I said having those rights in mind –

"[DEFENDANT]:  Oh, Okay . . .

"MOONEY:  Understanding those rights, will you talk to me if, if I, about, answer some questions I have?

"[DEFENDANT]:  Yeah."

In response to defense counsel's question, "But we just heard the tape and [defendant] did say 'No,'" Sergeant Mooney explained, "He—he looked like he was—didn't fully understand, and so that is why I repeated it to him."  Defendant subsequently answered Sergeant Mooney's questions about the offense; and at no time in the 27 minutes, 37 seconds interview did defendant invoke his right to counsel or his right to remain silent.

After the trial court heard the pertinent part of the interview, defense counsel submitted without argument.  The trial court concluded that defendant's *Miranda* rights

4

were not violated, finding that "the record is very clear that the admonition was given to [defendant]; he indicated that ultimately he did understand in having those rights in mind, that he did in fact wish to go ahead and talk to the interrogators."

Defendant contends that the trial court erred in denying his motion to suppress his in-custody statements because Sergeant Mooney did not honor his unambiguous invocation of his right to remain silent and, therefore, his subsequent confession was involuntary.

When reviewing a trial court's decision denying a motion to suppress statements purportedly obtained in violation of the defendant's Fifth Amendment rights, we defer to the court's resolution of disputed facts if supported by substantial evidence. (*People v. Smith* (2007) 40 Cal.4th 483, 502; *People v. Stansbury* (1995) 9 Cal.4th 824, 831.) Based on those facts, as found, and the undisputed facts, we independently review the trial court's legal rulings. (*Smith*, at p. 502; *People v. Weaver* (2001) 26 Cal.4th 876, 918.)

"As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" (*People v. Martinez* (2010) 47 Cal.4th 911, 947 (*Martinez*), quoting *Miranda*, *supra*, 384 U.S. at p. 479.) Once a suspect invokes his right to remain silent, law enforcement must "'scrupulously honor[ ]'" the invocation and cease questioning

5

him or her.  (*Michigan v. Mosley* (1975) 423 U.S. 96, 103; accord, *Berghuis v. Thompkins* (2010) ___ U.S. ___ [130 S.Ct. 2250, 2259] (*Berghuis*).)

The invocation of the right to remain silent, like the invocation of the right to counsel, must be both unambiguous and unequivocal.  (*Berghuis*, *supra*, 130 S.Ct. at p. 2259; *Martinez*, *supra*, 47 Cal.4th at pp. 947-948.)  As the United States Supreme Court explained, "There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously.  A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity. [Citation.]  If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'  [Citation.] Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity.  [Citations.]  Treating an ambiguous or equivocal act, omission, or statement as an invocation of *Miranda* rights 'might add marginally to *Miranda's* goal of dispelling the compulsion inherent in custodial interrogation.'  [Citation.]  But, 'as *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process.'"  (*Berghuis*, at p. 2260; accord, *Martinez*, at pp. 947-948 ["'[i]n order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect "must *unambiguously*" assert his right to silence'"]; *People v. Stitely* (2005) 35 Cal.4th 514, 535

6

["It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his right. [Citation.] Faced with an ambiguous or equivocal statement, law enforcement officers are not required . . . either to ask clarifying questions or to cease questioning altogether"].)

Defendant contends he unambiguously invoked his right to remain silent when, in response to Sergeant Mooney's question, "Having these rights in mind, do you, will you talk to me and answer some questions I have—" he said, "No."[3] We disagree. The record shows that before the sergeant completed his compound question, defendant interjected with "Well." This support's Sergeant Mooney's testimony that defendant appeared like he did not completely understand his rights or questions and, therefore, repeated them. Following defendant's "No," response, Sergeant Mooney asked defendant, "You don't want to talk to me?" Defendant responded with, "No, uh, what did you say?" After the sergeant repeated, "having those rights in mind" and "[u]nderstanding those rights, will you talk to me," defendant stated, "Oh, okay" and "Yeah." The record supports the trial court's finding that defendant was momentarily confused or did not fully understand Sergeant Mooney's question rather than an unambiguous invocation of the right to remain silent. (See *People v. Stitely*, *supra*, 35

---

[3] Defendant asserts exclusively a Fifth Amendment challenge in accordance with *Miranda*, *supra*, 384 U.S. 436, and does not argue (nor did he argue to the trial court) that his confession was coerced in violation of his federal due process rights. (See, e.g., *Dickerson v. United States* (2000) 530 U.S. 428, 433-434 [admission at trial of a defendant's statements made involuntarily to government officials violates defendant's due process rights].) Accordingly, we do not consider that question.

Cal.4th at p. 535 [if the request is ambiguous, the officer may ask clarifying questions to understand the defendant's request].)

Indeed, courts have found ambiguity in statements such as "'I think it's about time for me to stop talking'" (*People v. Stitely*, *supra*, 35 Cal.4th at p. 535) or "'I'm not going to answer any of your fucking questions'" and "'Fuck this, I'm not staying here anymore.'" (*People v. Farnam* (2002) 28 Cal.4th 107, 181.) The statements should be interpreted in the context in which they were made based on the totality of the circumstances. (*Ibid*.)

We find no constitutional violation here. When viewed in context, Sergeant Mooney reasonably could have interpreted defendant's "No" and "Well" responses as defendant not fully understanding Sergeant Mooney's question. Defendant's statement was not an unambiguous invocation of his right to be silent.

Nor can Sergeant Mooney's brief statements here be reasonably construed as repeated attempts, as defendant claims, "to wear down [defendant's] resistance" (*Michigan v. Mosley*, *supra*, 423 U.S. 96, 105-106), nor did he operate as such in light of "the 'totality of the circumstances.'" (*Moran v. Burbine* (1986) 475 U.S. 412, 421.) "In evaluating a claim of psychological coercion, the 'question posed . . . is whether the influences brought to bear upon the accused were "such as to overbear [defendant's] will to resist and bring about confessions not freely self-determined. [Citations.]"'" (*People v. Kelly* (1990) 51 Cal.3d 931, 952.) Sergeant Mooney repeatedly asking defendant whether he wanted to talk to him and whether defendant understood his rights were not calculated to exploit a particular psychological vulnerability of defendant or "wear down"

8

defendant's resistance in an effort to make him change his mind.  There was no evidence that the sergeant tricked or coerced defendant into surrendering his rights.  (See *People v. Riva* (2003) 112 Cal.App.4th 981, 989.)  Rather, the record demonstrates that defendant knowingly and voluntarily waived his rights.  An express waiver is not required where defendant's words and actions indicate that he intended to waive his rights.  (*People v. Whitson* (1998) 17 Cal.4th 229, 245-246, 250, citing *North Carolina v. Butler* (1979) 441 U.S. 369, 370-372, 374-375.)

Although we recognize defendant was not required to utter the exact word, he never stated specifically that he "wanted to remain silent or that he did not want to talk with the police." (*Berghuis*, *supra*, 130 S.Ct. at p. 2260.)  Significantly, defendant continued to talk freely well beyond his first and only "No" statement.  The circumstances taken in their context, and defendant's language and tone, failed to objectively communicate an unequivocal right to remain silent.  (See *Whitson*, *supra*, 17 Cal.4th at p. 249; *People v. Clark* (1993) 5 Cal.4th 950, 992, overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn 22.)

The purpose of an exclusionary rule is to deter police misconduct.  "Deterrence acts against a will and implies that there is a being capable of choosing one of several courses of action." (*People v. Neely* (1999) 70 Cal.App.4th 767, 789.)  But where, as here, the police have no clear signal that they are making a bad choice, they will not be deterred, and application of the exclusionary rule would be perverse.  Requiring an objectively unambiguous invocation of the right to silence, "'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity.

9

[Citation.] If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.' [Citation.] Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity." (*Berghuis*, *supra*, 130 S.Ct. at p. 2260; see also *Martinez*, *supra*, 47 Cal.4th at p. 949 [objective rule "provides a 'bright line that can be applied by officers in the real world . . . without unduly hampering the gathering of information'"].)

Defendant did not unambiguously state that he wanted to remain silent or that he did not want to talk to Sergeant Mooney. Had he made either of these simple, unambiguous statements, he would have invoked his "right to cut off questioning." (*Miranda*, *supra*, 384 U.S. at p. 474.) The trial court properly denied defendant's motion to suppress his in-custody statements.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

KING
J.

10