Filed 10/15/13  P. v. Jimenez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GERMAN JIMENEZ,<br><br>    Defendant and Appellant. | B241724<br><br>(Los Angeles County<br>Super. Ct. No. KA089986) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert M. Martinez, Judge.  Affirmed as modified.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant German Jimenez of three counts of willful, deliberate, premeditated attempted murder of a peace officer (Pen. Code, §§ 664, 187, subd. (a); counts 1-3);[1] two counts of assault on a peace officer with a semiautomatic firearm (§ 245, subd. (d)(2); counts 4 & 5); one count of assault upon a peace officer with a deadly weapon or by force likely to produce great bodily injury (§ 245, subd. (c); count 6); two counts of willful, deliberate, premeditated attempted murder (§§ 664, 187, subd. (a); counts 7 & 8); two counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 9 & 10); and one count of attempted carjacking (§§ 664, 215, subd. (a); count 11).  The jury found true the allegation as to counts 1, 2, 4, 5, 7, and 8 that appellant personally and intentionally discharged a firearm proximately causing great bodily injury (§ 12022.53, subds. (c) & (d)), the allegation that as to counts 9 and 10 appellant personally used a firearm (§ 12022.5) and inflicted great bodily injury as a result of discharging a firearm from a motor vehicle (§ 12022.55), and that as to count 9 appellant personally inflicted great bodily injury (§ 12022.7).

The court sentenced appellant to a total of two life terms, plus 145 years to life, plus 23 years and six months, consisting of the following:  40 years to life on each of counts 1 and 2 (15 years to life for the substantive offense, plus 25 years to life for the § 12022.53, subd. (d) firearm enhancement); 15 years to life on count 3; life on counts 7 and 8 plus 25 years to life for the section 12022.53, subdivision (d) firearm enhancement as to each count; the upper term of nine years on count 10, plus 10 years for the section 12022.5 firearm enhancement; and four years and six months on count 11 (half the upper term of nine years).  The sentences on counts 4, 5, 6, and 9 were stayed pursuant to section 654.  The remaining enhancements were stricken.

Appellant contends on appeal that, due to his voluntary intoxication, there was insufficient evidence to support the jury's finding that appellant formed the specific intent

---

[1]     All further statutory references are to the Penal Code.

to commit willful, deliberate, premeditated attempted murders of three peace officers and two other men, and attempted carjacking, and that the trial court erred by admitting appellant's statement to detectives purportedly taken in violation of appellant's *Miranda*[2] rights. Appellant also contends and the Attorney General correctly concedes that the trial court erred by imposing a consecutive sentence as to count 10, assault with a semiautomatic firearm, when the factual basis for that crime arose out of the same indivisible course of conduct as count 8, attempted murder, and therefore the sentence as to count 10 should have been imposed and stayed pursuant to section 654. We are not persuaded by appellant's contentions as to the specific intent crimes and admission of his statement. However, because we find the trial court erred by imposing sentence as to count 10, we direct the trial court to modify its judgment accordingly. In all other respects, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Prosecution Evidence

In the late afternoon on May 28, 2010, Javier Gonzalez and Abraham Carrasco were driving a company van to their workplace when they noticed a dark grey Malibu driving erratically. As Gonzalez drove the van into an intersection, the Malibu attempted to pass and collided with the van. The van and the Malibu, which was being driven by appellant and contained one passenger, pulled over to the curb. Appellant refused to give Gonzalez his license and insurance information, saying "Fuck you," and "I'm not giving you shit." Carrasco photographed appellant's license plate number. Appellant pointed at Gonzalez and Carrasco and said, "I'm going to get you guys," and then drove away. Gonzalez called the police.

Police Officer Rick George, a motorcycle officer, responded to the collision. Officer George parked his motorcycle next to the van, and Gonzalez and Carrasco showed him a picture of the Malibu's license plate.

---

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436.

3

Appellant returned, although with no passenger in the car, and parked the Malibu behind the van. Officer George asked appellant to step out of his car and provide his information, but appellant did not do so. Officer George called for backup. Corporal Glen Eugenio responded to the scene on his motorcycle. As Corporal Eugenio tried to speak to appellant, appellant pulled away from the curb, steered around the van, drove his car into a driveway just in front of the van, and stopped. Appellant then extended his right arm in the direction of his open passenger side window and fired a handgun three or four times at Officer George, Gonzalez, and Carrasco. Gonzalez immediately began running and tore a ligament in his right knee. Carrasco ran and hid behind the van but was hit in the lower leg with two bullets.

Using as cover a big rig stopped in the left-hand turn lane, Corporal Eugenio fired at appellant. Officer George ran toward appellant alongside the van, then ran across the street to join Corporal Eugenio, also firing back at appellant. Appellant backed out of the driveway and drove on the wrong side of the road directly toward the officers. Fearful that appellant would run over them, they dove under the big rig. Appellant continued to shoot at them, and they fired back. Officer George was struck by a bullet in the right arm, severing his ulnar artery and nicking his ulnar nerve, which resulted in permanent nerve damage. Corporal Eugenio was grazed in the leg by a bullet.

Appellant continued driving, turning onto Durfee Boulevard. Detective Ralph Batres, driving a marked police car at 47 miles per hour with its lights flashing and siren sounding, was responding to the scene when he encountered appellant in the Malibu, driving toward him. As the two cars approached one another, appellant suddenly accelerated and steered his car into Detective Batres's police car. Appellant's car struck the police car directly behind the driver's door. Detective Batres's car spun around, struck a parked car, and came to rest in the middle of the street. Detective Batres suffered neck and back injuries as a result of the collision. Appellant's airbag deployed, and although his car was damaged he was able to pull into the driveway of a business.

David Lopez was parked nearby. His 13-year-old son was also in the car and his 14-year-old daughter was about to get into the backseat of the car. Appellant, yelling and

4

acting bizarrely, got out of his car, ran to Lopez's car, and jumped on the hood. He came to the driver's door and tried to open it, then began pounding on the window until he broke it. He grabbed Lopez and tried to get him out of the car, but Lopez had his seatbelt fastened. Lopez removed his seatbelt, exited the car, and pushed appellant away. Appellant and Lopez began fist fighting. Appellant fell to the ground and Lopez backed away, but appellant began searching around his waistband with his hand so Lopez began hitting him again.

Detective Batres's head was spinning, but he saw appellant and Lopez fighting and stumbled toward them. When appellant began to run away Detective Batres used his taser to stop him.

Detective Adam Girgle responded to the scene and placed appellant in handcuffs, telling him he was being detained pending an investigation. Appellant was cooperative and coherent. Los Angeles County Fire Department personnel arrived and treated appellant, and he was responsive and cooperative in answering their questions. Detective Girgle accompanied appellant when he was transported by ambulance to the hospital. Detective Girgle did not question appellant, but appellant spontaneously stated that he had smoked methamphetamine earlier in the day. He said his car was struck by another vehicle, and that he had used a nine-millimeter black handgun to shoot at police officers from his car because he was tired of officers taking his car. He said he fired his gun until it was empty. He offered, "For what I did, I am guilty."

At the hospital, appellant was treated for a gunshot wound to the left hand and a graze wound to the shoulder. Appellant told Detective Girgle that after the collision he got out of his car, fought with someone, and tried to take that person's car. He said he was then "electrocuted" and asked Detective Girgle if he had tasered him. Detective Girgle observed that appellant was cooperative and did not seem agitated during the time they spent together.

Because appellant stated he had smoked methamphetamine that day, Detective Girgle had hospital personnel test him for drugs. Detective Girgle indicated on a drug influence report form that appellant exhibited some symptoms of being under the

5

influence. These included poor pupil reaction, severe muscle rigidity, and agitation. He did not know whether the latter two symptoms were due to being handcuffed to the gurney and having a gunshot wound, or due to narcotics use. Appellant displayed these symptoms only at the hospital and not at the crime scene or in the ambulance. Appellant's speech was clear and deliberate at all times. It did not appear to Detective Girgle that appellant's judgment was affected by drugs.

The police recovered a nine-millimeter Luger semiautomatic gun on the driver's side front floorboard in the Malibu. Twelve cartridge casings fired from the gun were found at the scene of the shootout with Officer George and Corporal Eugenio.

The Malibu was registered to Aldo Jimenez (appellant's brother) and had been parked at his sister's home in El Monte. Appellant was not permitted to drive the car at the time of the incidents described here, as the last time appellant drove it he was stopped for speeding and the car was impounded because appellant did not have a driver's license.

## II. Defense Evidence

### A. Stipulations

The parties stipulated that when appellant was tested at the hospital he had in his system 27 nanograms of amphetamines per milliliter of blood, and 141 nanograms of methamphetamine per milliliter of blood. When he was arrested, appellant had a piece of paper in his pocket that contained a brown crystal substance resembling methamphetamine, but the amount of the substance was insufficient to perform a test to determine its nature.

### B. Defense Testimony

Dr. Ari Kalechstein testified as an expert in psychology with specialty training in neuropsychology and forensic psychology. He said that methamphetamine use can cause impaired judgment, reasoning skills, and social perception. People who take methamphetamine are more likely to act without thinking about the consequences,

without planning, and without reasoning before they act. They can also become psychotic and experience hallucinations, delusions, and paranoia. Methamphetamine use can also cause people to act aggressively, to be irritable, and to snap at people. People react differently to methamphetamine use. Some users feel euphoric, alert, and more energetic. Methamphetamine has a half-life in the body of about 8 to 12 hours, so someone who used it early in the day could still be feeling the effects later in the day. Dr. Kalechstein did not know what time appellant had smoked methamphetamine the morning of the incident.

Appellant's hospital records indicate he was cursing, snapping his jaw, and being vulgar to the female nurses. Dr. Kalechstein said this type of irritable, aggressive behavior was common in people who are high on methamphetamine. He acknowledged there could be other explanations for appellant's behavior, however, such as his being upset and angry because he had been shot and was in pain, and because he was in police custody. Appellant's erratic driving and behavior toward Lopez were also consistent with methamphetamine use, as was the fact he escalated a minor traffic accident into gunfire.

Dr. Kalechstein did not meet with or interview appellant or obtain information about his background or medical history. His opinions were based on his review of the police reports, hospital records, and conversations with appellant's counsel. Because the police reports contained statements from appellant's family members indicating appellant's use of methamphetamine was problematic and affected his behavior, Dr. Kalechstein did not think it necessary to interview appellant.

Dr. Kalechstein opined that, "There is no other explanation for why [appellant] behaved the way he did, and so methamphetamine intoxication would seem to be the best explanation for his behavior." The fact that the fire department personnel who treated appellant at the scene did not observe typical physical symptoms of methamphetamine intoxication did not change Dr. Kalechstein's opinion. He noted that Detective Girgle observed some such symptoms.

7

### III.  Prosecution Rebuttal Evidence

Los Angeles Sheriff's Detectives Kevin Acebedo and Dan McElderry interviewed appellant in the hospital around 12:45 p.m. on May 29, 2010, the day after the incidents described above.  Appellant told them the Malibu belonged to him but was registered to his brother, Aldo Jimenez.  Appellant's car had been taken away five or six times because he did not have a driver's license.  It cost him over $3,000 each time to get it back, and he was angry about that.

Appellant said the collision occurred when Gonzalez refused to allow appellant to merge into traffic and intentionally struck appellant's car.  Appellant's friend, Ana, was in the car with him.  Appellant pulled over, as did the van, and Gonzalez and Carrasco began cursing at him and asking for identification and immigration papers.  This made appellant angry.  He refused to give them his information and they argued back and forth.  They laughed at appellant and implied that because he did not have a driver's license he could not do anything about the fact they had caused the accident.  Appellant dropped Ana off and returned to the scene.  Appellant was so angry that he felt he was "losing control."

When he returned he saw Officer George.  He refused to respond to Officer George's order to get out of the car because he knew he would lose his car again and he could not afford to get it back.  When Corporal Eugenio knocked on his window, appellant was angry and drove away.  He pulled out the gun, pulled into the driveway, and began shooting at Gonzalez and Carrasco because he was angry about how they had treated him.  He was not aiming at the police officers, but the officers began shooting at him.  One of the officers' bullets struck him as he drove away, and this made him even angrier and he turned his car around to shoot at the officers.  He saw the officers run under the big rig and fired at them until his gun was empty.

Appellant then drove away without a plan of where to go.  When he saw the patrol car he decided to crash into it because he was so angry.  He intended to kill the police officer or himself.

8

After the crash, appellant's car was not working properly so he looked for another car to take in order to get away. He told Lopez to give him his car but Lopez refused, so appellant struck the window hard and broke it. He and Lopez began fist fighting. Appellant saw a police officer approach and taser him.

As appellant was being interviewed, he was given morphine. At that point he told the officers that he felt people often laughed at him and insulted him. He believed people followed him and that there was a tracking device or surveillance cameras in his car. Appellant said he had been using methamphetamine for over one year. When he first used the drug it caused him to see faces, shapes, and ghosts, and to feel cold or as if a tornado was going through him. On the day of the offenses he had taken two "hits" of methamphetamine early in the morning. He did not feel cold or see ghosts that day. At the time of the offenses he felt almost nothing when he used methamphetamine except increased energy. Appellant said he knew it was an addiction and that he usually used methamphetamine three or four times per day so the energy would last all day.

## IV.    Defense Surrebuttal Evidence

Dr. Kalechstein noted that appellant's statements to Detectives Acebedo and McElderry demonstrated paranoia, including that appellant thought people were following him and laughing at him, and that he was under surveillance. He also exhibited psychotic hallucinations in that he said he saw ghosts and spirits. Dr. Kalechstein opined that appellant's criminal behavior was caused by his methamphetamine intoxication and that this opinion was bolstered by appellant's statements during the interview that he had been using methamphetamine for about one year. Appellant described being high on methamphetamine as losing control. Dr. Kalechstein indicated that was a layperson's way of explaining that when a person used methamphetamine they act without thinking and lose control of their ability to inhibit responses.

DISCUSSION

I.      **Substantial Evidence Supports the Finding that Appellant Formed the Specific Intent to Commit Counts 1, 2, 3, 7, 8, and 11**

Appellant contends there was insufficient evidence to demonstrate that he had the specific intent to commit willful, deliberate, premeditated attempted murder and attempted carjacking, because he was too intoxicated at the time of the offenses to form the specific intent to kill, to premeditate and deliberate, or to form the specific intent to commit carjacking.  We disagree.

A.      *Standard of Review*

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one.  '"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]"'  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)

"'"'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.  [Citations.]"  (*People v. Jones* (1990) 51 Cal.3d 294, 314.)'  (*People v. Ochoa*, *supra*, 6 Cal.4th at p. 1206.)"  (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.)

### B. Applicable Law Regarding Specific Intent Crimes

The offenses of attempted murder and attempted carjacking are specific intent crimes. To find appellant guilty of attempted murder (counts 1-3 and 7-8), the jury had to find that he had the specific intent to kill or harbored "express malice" as to each victim. (§§ 21a, 187, subd. (a) & 664; CALCRIM No. 600.) To find that the attempted murders were committed willfully, deliberately, and with premeditation, the jury had to find appellant's decision to kill was considered in advance and arrived at as a result of considered thought. "'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. . . . "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' [Citations.]'" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 . . . .)" (*People v. Young* (2005) 34 Cal.4th 1149, 1182. See also CALCRIM No. 601.)

To find appellant guilty of attempted carjacking (count 11), the jury had to find that he specifically intended to deprive Lopez of his car, accomplished by force or fear. (§§ 21a, 215, subd. (a) & 664, CALCRIM Nos. 460 & 1650. See, e.g., *People v. Marquez* (2007) 152 Cal.App.4th 1064, 1067-1068.)

As noted above, appellant contends there was insufficient evidence to demonstrate that he had the specific intent to commit willful, deliberate, premeditated attempted murder and attempted carjacking because he was too intoxicated to form the specific intent to kill, to premeditate and deliberate, or to form the specific intent to commit carjacking. A defendant is entitled to a jury instruction regarding voluntary intoxication when there is "substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' (*People v. Horton* (1995) 11 Cal.4th 1068, 1119; see also *People v. Saille* (1991) 54 Cal.3d 1103, 1117 [explaining that a defendant charged with murder is free to show that 'because of

his mental illness or voluntary intoxication, he did not *in fact* form the intent unlawfully to kill' (original italics)].)" (*People v. Williams* (1997) 16 Cal.4th 635, 677.)

CALCRIM No. 625, with which the jury here was instructed, provides that the jury may consider evidence of the defendant's voluntary intoxication only in a limited way. Here, the jury was permitted to consider such evidence only in deciding whether the defendant acted with an intent to kill, or acted with deliberation and premeditation, or acted with an intent to carjack. The instruction is based on section 29.4, which provides as follows: "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication *shall not be admitted to negate the* **capacity** *to form any mental states* for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. [¶] (b) Evidence of voluntary intoxication is admissible solely on the issue of *whether or not the defendant* **actually formed** *a required specific intent*, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (Italics and bold emphasis added.)

### C. Analysis

*By his own admission*, appellant returned to the scene of the collision with Gonzalez and Carrasco because he believed they had caused the accident and had been disrespectful toward him, and he was very angry at them. When he returned and was approached by officers, he considered the fact he did not have a driver's license and did not want to pay to get his car out of impound. He drove to the front of the van and positioned himself so he would have a clear shot at Gonzalez and Carrasco and began firing his handgun. He stated he was initially aiming only at Gonzalez and Carrasco, but when the peace officers began shooting at him and shot him in the wrist, he was angered and turned his car around in order to shoot back at the officers.

12

After appellant drove away he saw the patrol car being driven by Detective Batres and, again by his own admission, he decided to crash into it because he was so angry and intended to kill the police officer or himself.

After the crash, appellant's car was not working properly so he said he looked for another car to take in order to get away. He told Lopez to give him his car but Lopez refused, so appellant broke the driver's side window and began fist fighting with Lopez.

Detective Girgle testified that upon being arrested appellant was responsive, coherent, and cooperative. Although appellant was rude to the nurses at the hospital, and during his interview expressed bizarre statements about the effect methamphetamine had had on him since he began using it a year before, he nonetheless was coherent and remembered considerable detail about the events of the previous day, and specifically about his thought process and intent to commit the charged crimes. Appellant argues on appeal that methamphetamines impaired his judgment and perception, caused him to take risks and act aggressively, and exhibit paranoid and psychotic behavior. But these arguments go to appellant's *capacity* to form the specific intent to commit the charged crimes, not to whether he *actually formed* the required intent. The jury was called upon to determine whether he formed the specific intent required as to each crime, not to determine whether his reasoning process was sound. Methamphetamines might have played a role in appellant's incredibly poor decisionmaking, but by appellant's own admission he did in fact engage in a decisionmaking process in advance of his commission of each crime and reached a decision as a result of considered thought. The same evidence established that appellant premeditated and deliberated before attempting to kill his victims. Because there was ample evidence to support the jury's findings, the jury's resolution regarding the effect of appellant's alleged intoxication had on his formation of the requisite intent to kill and carjack and ability to premeditate and deliberate is conclusive on appeal.

13

## II.	Appellant's Statement to Detectives Was Properly Admitted

Appellant contends the trial court erred in admitting his statement to Detectives Acebedo and McElderry because the officers obtained his statement in violation of *Miranda v. Arizona*, *supra*, 384 U.S. 436.  He asserts he did not knowingly, intelligently, and voluntarily waive his right to counsel, and that he attempted to invoke this right but the detectives deceptively undermined his efforts to do so.  We disagree.

### A.	*Factual Background*

Detective Acebedo began by reading appellant his rights.  He informed appellant he had the right to an attorney before and during questioning.  Appellant indicated his understanding.  Detective Acebedo then told appellant that if he could not afford an attorney one would be appointed for him "before questioning if you wish; do you understand?"  Appellant replied, "In that situation, yeah, I don't have money to pay attorney.  Yeah, you put one or how that — would this work?"  He continued, "If I don't have the money —"  The detective said, "Then what happens is:  when you go to court, the court can appoint an attorney for you."  Appellant said, "Okay."  Detective McElderry added, "Yeah, there — they will represent you because you don't — because you don't have money."  Shortly thereafter he added, "But just so we're clear, we just wanna make sure that you're okay talking to us without getting to that point of, um, of getting an attorney; do you understand that?"  Appellant replied, "Yes."  Detective McElderry said, "Okay.  And you're okay talking with us right now and trying to explain what happened?"  Appellant said, "Yes."

Appellant was concerned that the detectives might not believe him, but the detectives said they would discuss that after appellant explained what had occurred.  Detective McElderry reiterated, "So, we just wanna make sure, are you okay talking to us now and taking care of that, right?"  Appellant then asked if a Spanish interpreter were available because although he could speak English, he might be able to express himself better in Spanish.  The detectives sent for an interpreter.  Detective Acebedo gave appellant a written form that stated the rights he had explained to appellant and indicated

14

appellant was choosing to waive those rights. Appellant signed the form. A Spanish-speaking deputy arrived and offered to readvise appellant in Spanish of his *Miranda* rights, but appellant indicated he had already signed the waiver form and had no problem, and that he understood his rights.

Defense counsel made a pretrial motion to exclude appellant's statement to the detectives on *Miranda* grounds. The court initially deferred ruling on the motion until the prosecution sought to admit the statement. The prosecution sought to introduce appellant's statement as rebuttal evidence after Dr. Kalechstein testified. The court excused the jury and held a hearing.

Defense counsel argued to the trial court, as does appellate counsel, that appellant's statement that he did not have money for an attorney was an indication he wanted an attorney immediately, and that the officers misleadingly responded by informing appellant that when appellant went to court counsel would be appointed for him. The court ruled that the police officer had explained that if appellant could not afford an attorney, one would be appointed for him, free of charge, at a time subsequent to their discussion. The officer specifically asked if appellant wanted to speak to them without hiring an attorney. Appellant indicated he understood his rights and was willing to talk to the detectives. He signed the waiver form and declined the detectives' offer to have the Spanish-speaking officer state his rights to him in Spanish, expressly indicating he already understood his rights and was willing to waive them.

### B.     *Analysis*

"Under the familiar requirements of *Miranda*, designed to assure protection of the federal Constitution's Fifth Amendment privilege against self-incrimination under 'inherently coercive' circumstances, a suspect may not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and to appointed counsel in the event the suspect is indigent." (*People v. Sims* (1993) 5 Cal.4th 405, 440.) The prosecution bears the burden of demonstrating that a defendant who makes a statement in the absence of counsel

knowingly and intelligently waived the privilege against self-incrimination and the right to counsel. (*People v. Peevy* (1998) 17 Cal.4th 1184, 1192.)

"[I]n order to determine whether a defendant voluntarily, knowingly, and intelligently has waived his *Miranda* rights, a court analyzing the question must consider two distinct components: 'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citations.]'" (*People v. Whitson* (1998) 17 Cal.4th 229, 247, quoting *Moran v. Burbine* (1986) 475 U.S. 412, 421.)

"'In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under [*Miranda*], we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence.'" (*People v. Whitson*, *supra*, 17 Cal.4th at p. 248, quoting *People v. Wash* (1993) 6 Cal.4th 215, 235-236.) Although appellate courts "'independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we "'give great weight to the considered conclusion' of a lower court that has previously reviewed the same evidence."'" (*Ibid.*)

Once a suspect has clearly asserted his or her right to counsel during custodial interrogation, the interrogation must cease and the suspect is not subject to further interrogation by the authorities until counsel has been made available to him. (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1122; *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485.) However, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require

16

the cessation of questioning." (*Davis v. United States* (1994) 512 U.S. 452, 459.) Whether a suspect has invoked his right to counsel is an objective inquiry. (*Ibid*.)

Here, in response to the detective informing appellant that if he could not afford an attorney one would be appointed for him "before questioning if you wish," appellant asked, "In that situation, yeah, I don't have money to pay attorney. Yeah, you put one or how that — would this work?" Viewed objectively, this question by appellant was not a clear assertion of his right to counsel. Appellant was expressing concern about his inability to afford an attorney, but he did not indicate he wanted a lawyer at that time. The detectives were not obliged to cease their questioning. They told appellant that "when you go to court, the court can appoint an attorney for you." Even if this statement could have misled appellant into thinking he could not have an attorney until he went to court—although he had just been told one would be appointed before questioning if he wanted—the detectives immediately clarified by saying, "But just so we're clear, we just wanna make sure that you're okay talking to us without getting to that point of, um, of getting an attorney; do you understand that?" Appellant affirmatively replied, "Yes." He proceeded to sign the waiver form and decline the detectives' offer to have his rights restated in Spanish. Based on these circumstances the trial court properly admitted appellant's statement. Appellant did not assert a desire to have counsel present before speaking to the police officers. He voluntarily relinquished his right, and the record does not support the assertion that his waiver occurred because the officers deceived him. The officers clarified the nature of his right and verified he understood, and thus his waiver was made with full comprehension of the right being abandoned and the consequences of doing so. The trial court did not err in admitting appellant's statement.

## III. The Sentence on Count 10 Must Be Stayed Pursuant to Section 654

Finally, appellant contends and the People concede that his sentence on count 10 for assaulting Gonzalez with a firearm must be stayed because it was based on the same indivisible course of conduct underlying his conviction on count 8 for attempted murder of Gonzalez.

Subdivision (a) of section 654 prohibits multiple punishments for "[a]n act or omission that is punishable in different ways by different provisions of law." Generally, multiple punishments are proper if the defendant pursues suitably independent criminal objectives. (*People v. Williams* (1992) 9 Cal.App.4th 1465, 1473-1474.) The test governing the application of section 654 was first stated in *Neal v. State of California* (1960) 55 Cal.2d 11, 19: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." In determining the appropriate sentence under section 654, a court must identify the count carrying the longest sentence, including enhancements, and stay the sentence imposed under the other pertinent counts. (*People v. Kramer* (2002) 29 Cal.4th 720, 722.)

Here, appellant was charged with an assault crime and attempted murder pertaining to each shooting victim, Officer George, Corporal Eugenio, Detective Batres, Gonzalez, and Carrasco. The court imposed a term for the attempted murder conviction and stayed the term for the assault conviction as to each shooting victim except Gonzalez. As to the counts involving Gonzalez, the court imposed consecutive terms for the assault count and the attempted murder count. The court indicated its intent to impose consecutive sentences only for counts involving separate victims of separate acts of violence which were therefore not subject to section 654. Thus, the court implicitly made the factual finding, which is supported by substantial evidence, that the shootout constituted an indivisible course of conduct, finding that separate sentences should be imposed only as to separate victims. There was nothing about appellant's shooting at Gonzalez that differentiates it from his shooting at the three other victims. The court's apparent oversight in failing to stay the sentence as to assault with a firearm on Gonzalez, count 10, must be remedied.

"If a trial court violates section 654, the proper remedy on appeal is not reversal of the counts involved, but elimination of the penalty for all but one of them (the one carrying the greatest penalty, if the penalties are disparate), by staying execution of, or

simply striking, the terms of imprisonment for all but one of them.  [Citations.]"  (*People v. Davis* (1989) 211 Cal.App.3d 317, 323; see *In re McGrew* (1967) 66 Cal.2d 685, 688.) Appellant's punishment must therefore be stayed for count 10.

## DISPOSITION

The judgment is modified to stay punishment for appellant's conviction for assaulting Javier Gonzalez with a firearm (count 10; § 245, subd. (b)).  In all other respects, the judgment is affirmed.  The superior court is directed to prepare an amended abstract of judgment to reflect the modification to appellant's sentence, and forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

SUZUKAWA, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.