Filed 1/9/26  P. v. Padillagomez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063078 |
| v. | (Super. Ct. No. 22CF0210) |
| BRAYAN PADILLAGOMEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gassia Apkarian, Judge. Affirmed.

The Law Offices of Jeffrey R. Lawrence and Jeffrey R. Lawrence for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Brayan Padillagomez was convicted of committing multiple sex offenses against teenage girls he met through social media. On appeal, he contends: (1) the trial court prejudicially admitted evidence of uncharged sexual misconduct reflected on his Instagram account; (2) the admission of his police confession violated due process; and (3) the trial court erred by denying his *Marsden* motions for substitution of counsel. (See *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).) Finding no basis to disturb the judgment, we affirm.

STATEMENT OF FACTS

L.M. met Padillagomez online via Instagram in the fall of 2021. At that time, L.M. was 13 years old and distraught with her home life. She agreed to meet Padillagomez in person because she wanted someone to talk to, and he was offering her drugs.

Their first encounter occurred in Padillagomez's car, not far from L.M.'s Santa Ana home. As promised, Padillagomez gave L.M. some marijuana, which she smoked; it made her feel "weird." When the conversation turned to age, L.M. told Padillagomez she was 13 years old, and Padillagomez said he was 19, but he was actually 23 at the time. As they continued talking, Padillagomez reached under L.M.'s shirt and touched her breast. Then he asked L.M. to remove her pants and sit on his lap, so they could have intercourse. L.M. told Padillagomez she did not want to have sex. After pushing his hand away, she got out of the car and walked home.

A few weeks later, L.M. agreed to meet Padillagomez again. He picked her up outside her home around 2:00 a.m. and plied her with marijuana and alcohol as they drove around in his car. They ended up at his apartment building, and by that time, L.M. was so intoxicated she could hardly make it up the stairs to Padillagomez's apartment. Once they got

inside, L.M. proceeded to fall asleep in Padillagomez's bedroom. When she awoke, her clothes were off, and she felt pain in her vagina, thighs, and waist. Although she was menstruating, the bleeding was heavier than usual. L.M. was not sure what to do at that point. She ended up drinking and smoking with Padillagomez some more before eventually having him drive her home.

L.M. did not see Padillagomez again after that. Although he barraged her with Instagram messages and tried to get in touch with her through her online friends, L.M. was afraid of Padillagomez and avoided him altogether.

At the time, one of L.M.'s online friends was S., who lived out of state. S. sent L.M. screenshots of Instagram conversations she had with Padillagomez regarding his desire to see L.M. again. In addition, S. forwarded L.M. a photo S. had received from Padillagomez in which L.M. was naked from the waist down.

During her Instagram exchanges with Padillagomez, S. told him she was 14 years old, which was true, and he said he was 17. Despite S.'s age, Padillagomez asked her to send him nude photos of herself and told her he wanted to have sex with her. When S. balked at the idea, Padillagomez bragged about having sex with L.M. five times and promised S. he could teach her some things about sex if she let him "fuck" her. Padillagomez also offered S. drugs and said he would show her a video of him having sex with L.M. if S. would be willing to get together with him. But she never did.

In January 2022, after several weeks of Padillagomez's online harassment, L.M. told her therapist about her encounters with Padillagomez. That led to the police contacting L.M. and Padillagomez's arrest. When interviewed by investigators, Padillagomez initially denied knowing L.M., but

3

he eventually confessed to having sexual intercourse with her multiple times. He also admitted knowing L.M. was a minor, although he claimed she had told him she was about to turn 18 when they first met online and in person.

During their subsequent investigation, the police learned Padillagomez may have contacted other minors around the time he victimized L.M., including C.S. At trial, C.S. testified that after receiving an Instagram message from Padillagomez when she was 12 years old, she and her 13-year-old friend, E.P., met Padillagomez at a park in Anaheim. At the park, Padillagomez kissed C.S., which made her uncomfortable, but she and E.P. eventually agreed to go to Padillagomez's apartment with him.

At the apartment, Padillagomez shared alcohol with the girls and offered them marijuana. He also told them he would give them money if they gave him oral sex. Although the girls turned down the offer, Padillagomez kissed E.P. on the mouth while touching her leg, and he talked C.S. into joining him in his bedroom, where she soon passed out. When C.S. awoke, her pants were untied, and Padillagomez was touching her genitals. After gathering herself, C.S. asked Padillagomez to drive her and E.P. to a mall in Santa Ana, which he did. Suspecting C.S. was upset with him, Padillagomez messaged her later, asking if he could make it up to her. She replied she was not interested because he had "deadass raped" her.

E.P. did see Padillagomez again, though. She messaged Padillagomez later that same week to let him know that she and her friend, J., were willing to have sex with him for money. But that never happened. Padillagomez did pick up E.P. and J. at a park, drink and smoke with them, and take them back to his apartment in anticipation of having sex. However, the girls changed their minds and decided they did not want to have sex with

4

Padillagomez after all. Padillagomez was upset about that, but he drove E.P. and J. back to the park, as they requested.

Based on this evidence, Padillagomez was charged with committing multiple crimes against L.M., S., C.S., and E.P. At his trial, the prosecution also presented evidence of Instagram messages between Padillagomez and other minor teenage girls. The messages, which were found on Padillagomez's phone after his arrest, indicate he offered the girls drugs and money for sex, and he actually had sex with one of them. However, Padillagomez was not charged for that misconduct. Rather, it was offered to prove Padillagomez had a propensity to commit sex crimes and as circumstantial evidence of his intent to commit the charged offenses.

During the defense case, Padillagomez took the stand and denied touching L.M. during their first encounter in his car. He did admit having sex with L.M. during their second encounter, at his apartment. But he claimed the sex was consensual and he thought she was 18 years old at the time.

Padillagomez also admitted drinking and smoking marijuana with C.S. and E.P. at his apartment. However, he testified he did not touch them in a sexual manner or offer them money for sex.[1] Padillagomez also denied doing anything wrong when he met up with E.P. and J. later that week.

When asked about the Instagram messages to the uncharged victims that were found on his phone, Padillagomez claimed he was "probably high" and just joking around when he sent them. He claimed he never met or intended to meet any of those girls in person.

---

[1] In an attempt to discredit C.S., the defense presented evidence that C.S. had once falsely accused a boy in her junior high school gym class of touching her private parts.

In the end, the jury was unable to reach a verdict on the charges that Padillagomez sent S. pornography and contacted her with the intent to commit a sex offense. The jury also deadlocked on the charge that Padillagomez committed a lewd act by kissing C.S. in the park. Those charges were dismissed following the verdict.

However, the jury convicted Padillagomez of committing five lewd acts against L.M. when she was under the age of 14 and of administering drugs to L.M. to commit a felony. (Pen. Code, §§ 288, subd. (a), 222.) The jury also found Padillagomez guilty of administering drugs to C.S. to commit a felony, as well as contacting E.P. with the intent to commit a sex offense, and committing a lewd act against E.P. when she was under the age of 14. (*Id.*, §§ 222, 288.3, subd. (a), 288, subd. (a).)

In addition, the jury found true allegations Padillagomez committed a lewd act against more than one victim and had substantial sexual contact with L.M. (Pen. Code, §§ 667.61, subds. (b) & (e), 1203.066, subd. (a)(7), (8).) The trial court sentenced Padillagomez to an aggregate term of 33 years to life in prison for his crimes.

DISCUSSION

Padillagomez contends the trial court abused its discretion by admitting the uncharged misconduct evidence reflected on his Instagram account. He also contends his police confession should have been excluded as involuntary and the court erroneously denied two *Marsden* motions he made during the course of the proceedings. We find no merit to these contentions.

# I.

## THE UNCHARGED MISCONDUCT EVIDENCE

*A. Factual Background*

Before trial, the parties litigated the admissibility of various Instagram messages the police found on Padillagomez's phone following his arrest. The messages are from conversations Padillagomez had with 20 Instagram users who are identified in the record only by their online names, so their true identities are unknown. It is clear from the content and context of the messages, however, that Padillagomez believed he was talking to girls. He offered many of them drugs or money in exchange for sex or nude photos. And based on one series of messages, it appears Padillagomez actually met and had sex with one of the girls, who said she was 15 years old.

The prosecution argued the messages were admissible pursuant to Evidence Code section 1108 to prove Padillagomez had a propensity to commit sex offenses.[2] It also contended the messages were admissible under section 1101, subdivision (b), to prove (1) Padillagomez had the requisite intent to commit the charged offenses; (2) he did not mistakenly believe the victims of the charged offenses were old enough to consent to sex; and (3) he used his Instagram account as part of a plan to sexually exploit teenage girls. Defense counsel objected to the messages on multiple grounds, including they were unduly prejudicial within the meaning of section 352.

Of the 20 conversations offered by the prosecution, the trial court admitted eight and excluded 12. In all eight of the admitted conversations, the recipient of Padillagomez's messages indicated they were a minor. (The

---

[2] Unless noted otherwise, all further statutory references are to the Evidence Code.

7

age range for the group was between 12 and 16 years old.) The court ruled the conversations in which Padillagomez solicited sex from the recipient (four in total) or had sex with the recipient (only one) were admissible as propensity evidence; the other three conversations were admissible to show Padillagomez's intent and that he liked to shop around on the internet for underage victims to sexually exploit. The court excluded the remaining 12 conversations under section 352 as cumulative and potentially misleading, because the age of the recipients was not reflected in those messages.

At trial, transcripts of the conversations were admitted into evidence and they were briefly described by a police officer who was involved in the investigation into Padillagomez's alleged crimes. For example, the officer testified that in one of the conversations, Padillagomez offered to give the other person "edibles or weed" if she "let him fuck [her] low-key." And in another conversation, Padillagomez asked an Instagram user who said she was 13 years old if she wanted to earn money by making a sex tape.

*B. Applicable Law and Standard of Review*

Evidence of a defendant's uncharged misconduct is generally inadmissible to prove his conduct on a specific occasion or his propensity for criminal activity. (§ 1101, subd. (a).) However, such evidence may be admitted to prove some other material fact in the case, such as intent, plan, or absence of mistake. (*Id.*, subd. (b).) An exception to the propensity rule also exists in cases involving sex crimes. In such cases, "evidence of the defendant's commission of another sexual offense . . . is not made inadmissible by [s]ection 1101, if the evidence is not inadmissible pursuant to [s]ection 352." (§ 1108, subd. (a).)

Section 352 empowers trial courts to exclude evidence if its probative value is substantially outweighed by the probability its admission

8

would cause undue prejudice, confusion, or delay. For purposes of this section, prejudice "is not synonymous with 'damaging,' but refers instead to evidence that "'uniquely tends to evoke an emotional bias against [a] defendant'" without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.) The trial court has broad discretion in deciding whether evidence rises to this level, and its decision will not be disturbed on appeal unless it was ""'arbitrary, capricious, or patently absurd.""" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

*C. Analysis*

Padillagomez does not dispute the uncharged misconduct evidence reflected in the eight Instagram conversations the trial court admitted was relevant to prove his intent and propensity to commit the charged offenses, as permitted under sections 1101, subdivision (b) and 1108. However, he claims the evidence should have been excluded under section 352 because it was cumulative and unduly prejudicial.

But in regard to prejudice, the uncharged evidence reflected in Padillagomez's Instagram conversations was not materially different from or any more prejudicial than the evidence regarding the charged offenses. The uncharged evidence consisted of online messages in which Padillagomez solicited sex from underage girls in exchange for money or drugs, and that is what the evidence pertaining to the charged offenses reflected. If anything, the uncharged evidence was tamer than the evidence pertaining to the charged offenses, in that L.M. and C.S. both accused Padillagomez of sexually assaulting them after they had passed out from the alcohol and drugs he had given them. This circumstance lessened the prejudicial impact of the uncharged evidence. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 205; *People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

9

Padillagomez claims there was simply no need for the uncharged evidence because, based on the victims' testimony alone, the jury would have known he had a proclivity for preying on underage girls on Instagram. However, as was his right, Padillagomez attacked the victims' credibility at trial, and he denied the charges when he took the stand. The uncharged evidence was relevant to help the jury decide who was telling the truth and who was not. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 [evidence of uncharged sexual misconduct is admissible to assist the trier of fact in evaluating the victim's and the defendant's credibility].)

Moreover, in the interest of fairness, the trial court excluded the majority of the uncharged conversations the prosecution was seeking to introduce. For all these reasons, the trial court did not abuse its discretion or impair Padillagomez's right to a fair trial by admitting the challenged evidence.

*D. Related Argument*

In addition to challenging the admissibility of the uncharged misconduct evidence, Padillagomez contends the jury instruction regarding that evidence was flawed. Again, we disagree.

Pursuant to CALCRIM No. 1191A, the jury was instructed it could infer Padillagomez had a propensity to commit sex offenses if the uncharged misconduct evidence proved by a preponderance that he committed one of the following crimes: (1) lewd conduct with a child under the age of 14 (Pen. Code, § 288, subd. (a)); (2) contacting a minor to commit a sex offense (*id.*, § 288.3, subd. (a)); or (3) annoying or molesting a minor while harboring an unnatural sexual interest in the minor (*id.*, § 647.6).

According to Padillagomez, the instruction was improper because the prosecution never proved the uncharged conversations he had with other

10

Instagram users involved real girls, and only two of those users indicated they were under the age of 14 so as to satisfy the age requirement in Penal Code section 288, subdivision (a). As noted above, however, one of the users Padillagomez contacted and propositioned indicated she was only 15 years old, and judging by the content of their messages, Padillagomez actually had sex with her. From this evidence, the jury could reasonably infer Padillagomez violated Penal Code sections 288.3 and 647.6, two of the offenses listed in the instruction. For that reason alone, the instruction was fitting.

The fact the instruction referenced an additional offense, lewd conduct under Penal Code section 288, subdivision (a), that was not supported by the evidence is not cause for reversal. That is because when the jury is given multiple theories to support an instruction, some of which are supported by the evidence and some of which are not, we presume it adopted the factually supported ones. (*People v. Aledamat* (2019) 8 Cal.5th 1, 8; *People v. Guiton* (1993) 4 Cal.4th 1116, 1125, 1128–1129.) That being the case, any error in including Penal Code section 288, subdivision (a) in the instruction on the uncharged misconduct evidence was patently harmless. (*People v. Aledamat, supra*, at p. 8; *People v. Guiton, supra*, at pp. 1125, 1128–1129.)

II.

THE POLICE CONFESSION

We also uphold the trial court's decision to admit Padillagomez's police confession into evidence. Padillagomez asserts his confession was involuntarily rendered in violation of due process, but we do not see it that way.

11

*A. Factual Background*

Padillagomez was interviewed at the Santa Ana police station following his arrest, on the afternoon of January 27, 2022. A recording of the interview was admitted into evidence at trial and has been transmitted to this court to facilitate our understanding and consideration of Padillagomez's due process claim.

The interview took place in a small room with Padillagomez seated opposite two police officers—Gaeta and Granados—who were wearing jeans and dark polo shirts emblazoned with the Santa Ana Police logo. Padillagomez was not handcuffed or physically restrained in any manner. Asked at the start of the interview if he needed to use the restroom or get some water, Padillagomez said he did not.

After the officers engaged Padillagomez in small talk about his tattoos and cologne, Officer Gaeta told Padillagomez he wanted to talk to him because his name came up in an investigation. Officer Gaeta then asked Padillagomez if he wanted his rights read to him in Spanish or English. Padillagomez, whose fluency in English is evidenced throughout the interview, opted for the latter.

Officer Gaeta read Padillagomez his *Miranda* rights line-by-line. (See *Miranda v. Arizona* (1966) 384 U.S. 436, 479 (*Miranda*) [prior to custodial interrogation, the police must inform suspects they have the right to remain silent, anything they say can be used against them, they have the right to an attorney, and if they cannot afford an attorney, one will be appointed to them free of charge].) After each line, Officer Gaeta asked Padillagomez if he understood the particular right alluded to, and each time he said yes.

12

Officer Gaeta then asked Padillagomez about his work and what he liked to do for fun. On the latter topic, Padillagomez answered "nothing really. Just smoke weed and stay home, basically." He said smoking marijuana helped relieve his depression and anxiety. He also said he and his family arrived here from Mexico, his parents were divorced, and he was currently living with his mother in Anaheim.

After assuring Padillagomez he was not going to get in trouble for smoking marijuana, Officer Gaeta told him, "The most important thing here is to be upfront. [¶] . . . [¶] . . . I get it. . . . [M]istakes happen. We all make mistakes. . . . [W]e're just trying to talk it out and figure out why these mistakes happen."

Padillagomez said he had never been in trouble and he did not want to go to jail because he did not have "papers" and could get deported. Officer Gaeta replied, "[T]hat's nothing we deal with. Nothing like that. Like I said, your name came up in an investigation and we just want to clear a few things up. . . . I know you will be able to clear it up for us. And the reason I tell you this is, is just be upfront, be honest with us. . . . I don't think me and my partner have treated you like, like a dick. Right, no?" Padillagomez answered, "No, you guys have been pretty chill."

Officer Gaeta then asked Padillagomez if he knew or had ever dated L.M., and he said no. In fact, Padillagomez said he had never dated anyone while living in California. He also claimed he was not active on social media. While admitting he had an Instagram account in the past, he said he had deleted it. When Officer Gaeta asked if he could check his phone to confirm that, Padillagomez said no. Officer Granados also asked Padillagomez for permission to search his phone, but he declined her request as well.

13

Officer Gaeta told Padillagomez, "[W]e understand you don't [want to] give us consent to go through your phone. Completely understand. But then, we're gonna get a search warrant and go through your phone anyways. Okay. And at that point, we're gonna find your Instagram [account]. Right. And then we're gonna have, find the conversations that you had with [L.M.]. And then we're gonna come back and ask you . . . why'd you lie to our face? . . . [Y]ou just told us you didn't know [L.M.] when clearly you do. Right? So, that's why I'm telling you it's better to be honest, upfront. Some of the questions that I'm asking you, I already know the answers to. Okay. So, do you want to start all over? Or do you want to continue?"

Padillagomez said, "Yeah, I just, really don't know what I'm doing. I don't want to get in trouble. I don't want to go to jail. . . . I do know why you guys are here [¶] . . . [¶] and I know everything. [¶] . . . [¶] But am I gonna get in trouble for it? 'Cause I know you guys like to twist words and I feel like if I tell you guys straight-up, you guys are gonna twist that towards me and get me in trouble."

Officer Gaeta replied: "I understand what you're saying. Is what you did wrong? Yes. Is it the crime of the century where you killed somebody and you robbed somebody? Does it make you a bad person? No. We both know what you did. Okay. We have . . . the proof [of] what you did. Okay. The reason that we're here talking to you is because you don't have a record. . . . [Y]ou're not a bad person. So, I'm giving you the opportunity to explain yourself. It's not about what you did but why you did it. Okay. 'Cause there's different types of people that do this and I know you know what we're talking about." Officer Gaeta then proceeded to draw a distinction between people who are bad, and people who make mistakes. When Padillagomez said he just made a mistake, Officer Gaeta told him "we need to hear it from you."

14

At that point, Padilla admitted getting together and smoking marijuana with L.M. He said L.M. told him she was about to turn 18 and led him to believe she cared for him. And although Padillagomez later discovered L.M. was only 13 at the time, he claimed she looked older than that in person. Officer Gaeta told Padillagomez "she does look older. I've seen her." Then Officer Granados returned to the topic of deportation, telling Padillagomez "I know . . . you don't want to get in trouble. Like you don't want to get deported. You know, you don't have papers. We're not la migra," an apparent reference to immigration authorities.

Padillagomez responded, "I know but [¶] . . . [¶] . . . I'm pretty sure that, after this, you guys are gonna try to take me to jail. Even if I go to jail for even one day, two days; I'm gonna lose it all. I lose my parents. I lose my job. I pretty much lose everything I came here to work for." When Officer Gaeta asked Padillagomez why he thought he would be going to jail, he said, "Cause I pretty much had sex with a minor."

Padillagomez initially said he only had sex with L.M. one time, in his truck. But when Officer Gaeta told him they had a video of him having sex with L.M. in his apartment, Padillagomez admitted having sex with L.M. there, too. He said it happened "in the moment" because he was lonely and he now regretted it. He also said he did not want people to think of him as a bad guy or a rapist.

Officer Gaeta told Padillagomez he understood, and he did not think Padillagomez was a bad guy for giving in to his emotions. He also told Padillagomez, "[T]hat's why we're giving you the opportunity to talk. 'Cause . . . we have those videos [but]we don't [have] your side of the story; . . . it just seems one-sided and I don't think that's fair for you. Right?

15

So that's why I need to get into detail . . . 'cause I'm gonna document everything you tell me. And this is your time to tell the truth."

After that, Padillagomez admitted to having sexual intercourse with L.M. "like four times." He further admitted recording their sexual activity and sending a copy of the recording to L.M.'s friend, S. And he admitted asking S. to send him nude photos of herself. Although Padillagomez conceded he "fucked up" and did some things that "look[] really horrible," he insisted he was "not a bad guy" and did not force anyone into having sex with him.

Officer Gaeta told Padillagomez he did not think he was a bad guy and commended him for being honest and owning up to his mistakes. Padillagomez took that to mean he was not going to get in much trouble for doing what he did. In fact, he told the officers that, because he had told the truth and they had been "really chill" with him, he did not think he would have to go to jail. When informed otherwise, Padillagomez complained the officers had twisted his words. But when Officer Gaeta reminded him that he never promised him anything, Padillagomez agreed. He said he was not mad at the officers, but he was mad at himself for having "fucked up."

Before trial, Padillagomez moved to suppress his statements on the grounds they were involuntarily rendered in violation of his due process rights. After a brief hearing on the matter, the trial court denied the motion.

*B. Applicable Law and Standard of Review*

""""The Fourteenth Amendment of the federal Constitution and article I, section 7 of the California Constitution make 'inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion.'" [Citation.] The prosecution must prove by a preponderance of the evidence that a defendant freely and voluntarily gave

16

police statements before the statements can be admitted.'" (*People v. Suarez* (2020) 10 Cal.5th 116, 157.)

"A statement is involuntary if it is not the product of "'a rational intellect and free will.'" [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' [Citation.] "'The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were 'such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.' [Citation.]" [Citation.] In determining whether or not an accused's will was overborne, "an examination must be made of 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'"'" (*People v. Maury* (2003) 30 Cal.4th 342, 404.)

When, as here, the interview in question was recorded and the facts surrounding it are undisputed, we independently review the record to determine whether the defendant's confession was voluntarily rendered. (*People v. Suarez, supra,* 10 Cal.5th at p. 158.)

*C. Analysis*

Padillagomez contends his confession was involuntary because he did not knowingly waive his *Miranda* rights and the officers made him improper promises of leniency that undermined his free will. We are not persuaded.

Under *Miranda*, the police are not only required to advise suspects of their rights prior to questioning; they must also obtain a knowing and intelligent waiver of those rights from the suspect. (*Miranda, supra*, 384 U.S. at p. 479.) Here, the record shows Officer Gaeta read Padillagomez his *Miranda* rights one at a time, and after each right, asked Padillagomez if he

17

understood it. Padillagomez answered "yes" each time, but Officer Gaeta did not ask him if he wanted to waive his *Miranda* rights, nor did Padillagomez expressly agree to do so.

However, waivers come in many forms. Although the better practice is for police to obtain an express waiver from the suspect, "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." (*North Carolina v. Butler* (1979) 441 U.S. 369, 373.) Indeed, "'[o]nce the defendant has been informed of his [*Miranda*] rights, and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows of his rights and chooses not to exercise them.'" (*People v. Whitson* (1998) 17 Cal.4th 229, 248, quoting *People v. Johnson* (1969) 70 Cal.2d 541, 558, disapproved on other grounds in *People v. DeVaughn* (1977) 18 Cal.3d 889, 899, fn. 8; see also *Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 ["Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent"].)

Although Padillagomez was reluctant to admit what he did to L.M., he never objected to being interviewed or requested an attorney. Nor did he express any confusion about his rights when Officer Gaeta explained them to him. And throughout the interview, his answers were on point and articulate as a whole. It is thus reasonable to conclude that, by acknowledging he understood his *Miranda* rights and then proceeding to answer the officers' questions, Padillagomez knowingly and voluntarily waived his rights. (*People v. Cruz* (2008) 44 Cal.4th 636, 668–669; *People v. Whitson, supra*, 17 Cal.4th at pp. 247–250; *People v. Medina* (1995) 11

18

Cal.4th 694, 752; *People v. Sully* (1991) 53 Cal.3d 1195, 1233; *People v. Davis* (1981) 29 Cal.3d 814, 823–826.)

Padillagomez correctly notes that, once the interview was underway, he told the officers at one point, "I just, really don't know what I'm doing. I don't want to get in trouble. I don't want to go to jail." Padillagomez argues this was "essentially" a request to invoke his *Miranda* rights and stop talking. But Padillagomez made those comments in response to Officer Gaeta's assertion that the police were going to find incriminating information on his phone, which suggests he was merely expressing exasperation with his predicament. His comments did not constitute an unambiguous invocation of his right to remain silent that required the officers to terminate questioning. (See *Berghuis v. Thompkins, supra*, 560 U.S. at p. 381 [after a suspect has been advised of his *Miranda* rights, his interrogators need not cease questioning until the suspect has unambiguously invoked his right to remain silent]; *People v. Stitely* (2005) 35 Cal.4th 514, 535 [same].)

Nevertheless, Padillagomez argues his confession was involuntary for other reasons, including the fact he was only 23 years old and expressed a fear of being deported. Padillagomez claims he "was an easy mark for [the officers], and they had no problem taking advantage of his low education level, his inexperience with the criminal justice system, and his naivety and immaturity in general."

However, there is no evidence the officers knew of Padillagomez's education level, and Padillagomez did not appear to have any difficulty understanding or answering the officers' questions, which were posed in a calm and professional manner.

In addition to being courteous to Padillagomez during the interview, the officers also respected his right to privacy when he refused to

19

give them consent to search his phone. This aspect of the interview is telling because, although the officers made repeated requests to search the phone, Padillagomez did not give in and let them do so. This shows he was not afraid to stand up to the officers and assert his rights during the interview, which lasted less than 45 minutes.

Padillagomez also contends the officers improperly induced his confession by falsely promising him he would not be deported if he told them the truth about what he had done with L.M. The record does not support that characterization. In response to Padillagomez's concerns about being deported, the officers told him they were not concerned about his immigration status because that was not their job. They never promised Padillagomez he would not go to jail or face adverse immigration consequences by speaking the truth. This is something that Padillagomez himself admitted—albeit begrudgingly—at the end of the interview.

In arguing his confession was involuntary, Padillagomez also points out the officers accused him of lying about not having an Instagram account on his phone and minimized his culpability by telling him he was not a bad person for making mistakes. However, police interrogation will necessarily "'involve some pressure because its purpose is to elicit a confession.'" (*United States v. Santos-Garcia* (8th Cir. 2002) 313 F.3d 1073, 1079.) "'[T]here is nothing inherently wrong with efforts to create a favorable climate for confession,'" which is what the officers did in this case. (*Ibid.*; see also *People v. Jones* (1998) 17 Cal.4th 279, 297 [whereas "'adversarial balance, or rough equality, may be the norm that dictates trial procedures, it has never been the norm that dictates the rules of investigation and the gathering of proof'"].)

20

In fact, it has long been held the police may utilize a variety of "deceptive stratagems to trick [a suspect] into confessing." (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280.) So, even though Padillagomez may now subjectively believe the officers tricked him into confessing, that does not prove his statements were involuntarily rendered. It is important to remember that, irrespective of a suspect's understanding of the situation, a confession will not be deemed involuntary unless it is the product of coercive police activity. (*Colorado v. Connelly* (1986) 479 U.S. 157, 164–165.) Nothing the officers did in this case can fairly be characterized as coercive.

Considering all the circumstances attendant to Padillagomez's interrogation, we find no violation of his due process rights. The trial court did not err by admitting his confession into evidence.

## III.

### THE *MARSDEN* MOTIONS

Lastly, Padillagomez asserts the trial court abused its discretion in denying his repeated requests for a new attorney pursuant to *People v. Marsden, supra*, 2 Cal.3d 118. The argument is not well taken.

*A. Factual Background*

1. First *Marsden* Motion

Padillagomez's initial *Marsden* motion was heard on July 26, 2023, about three weeks before his trial started. During the hearing, he told the trial court he wanted new counsel because he and his court appointed attorney were not getting along and he was not receiving effective assistance of counsel. More specifically, Padillagomez accused his attorney of using profanity toward him, lying to him, not listening to him, not communicating enough with him, not working hard enough for him, pressuring him to plead guilty, and not getting his case to trial sooner.

When asked to respond to these allegations, defense counsel conceded he and Padillagomez had butted heads over trial strategy, and he did call Padillagomez a "mother fucker" when they met the previous day. Counsel said he lost his cool because, after having strategized with Padillagomez for several months about his expected testimony, Padillagomez wanted to change his story and go in another direction, which counsel felt would hurt his case. While admitting it was unprofessional for him to get angry and swear at Padillagomez, counsel said his anger came from a place of concern for his client's best interests at trial.

During the hearing, defense counsel also addressed the plea negotiations. Because Padillagomez was facing a potential life sentence, defense counsel recommended that he accept the prosecution's plea offer of 20 years in prison, which counsel described as Padillagomez's "best worst option." However, Padillagomez was not interested in the offer because he believed he was not guilty.

As for his other communications with Padillagomez, defense counsel explained he had talked to Padillagomez on multiple occasions about the motions he intended to file and what his trial strategy was going to be. Although counsel had initially hoped he would be able to suppress the Instagram messages the police found on Padillagomez's phone, he realized that would not be possible after the prosecution produced the judicially authorized search warrant pursuant to which the messages had been seized.

During the hearing, counsel also explained why the case had taken longer than expected to get to trial. He said he had to finish up another trial he was working on, and there had been a period of Covid-related delays during which Padillagomez was not permitted to appear in court.

22

Nevertheless, given that he had been working on Padillagomez's case for several months, counsel believed he had developed a successful trial strategy.

In the end, the trial court was satisfied defense counsel was representing Padillagomez effectively and he could continue to do so going forward. The court therefore denied Padillagomez's request for a new attorney. In so doing, the court reminded Padillagomez that, although he had the right to reject the prosecution's plea offer and take the case to trial, his attorney was responsible for formulating his trial strategy. The court also urged Padillagomez and counsel to speak kindly to each other and refrain from using profanity.

2. Second *Marsden* Hearing

On August 17, 2023, after two full days of trial testimony, Padillagomez again requested a new attorney. This time, he said he was unhappy with how his attorney was cross-examining the prosecution's witnesses. In addition, Padillagomez accused his attorney of not providing him with discovery and lying to him about "a bunch of stuff." When asked for an example of the alleged lying, Padillagomez claimed counsel failed to come through on his promise to subpoena the victims' school records. However, the trial court explained to Padillagomez those records had in fact been subpoenaed by his attorney and reviewed by the court.

During the hearing, Padillagomez also suggested he did not understand he was facing a possible life sentence. He said that when the prosecution offered him a deal of 17 to 20 years in prison, he turned it down because his attorney told him that, even if he were convicted, the most he could get was 17 years.

Padillagomez also reiterated his complaints that defense counsel was not communicating with him or fighting hard enough on his behalf.

23

Citing "irreconcilable conflicts" with his appointed attorney, Padillagomez said he wanted to hire a new attorney, which his family would pay for.

In response, defense counsel informed the court he had numerous discussions with Padillagomez about the case over the past several months. And he had provided Padillagomez with discovery and personally visited him in jail on multiple occasions to talk strategy and prepare him to testify. Counsel also described the motion work he did before trial and explained what he was attempting to accomplish through his cross-examination of the prosecution's witnesses.

Regarding a possible plea deal, defense counsel told the trial court the prosecution's offer of 17 to 20 years in prison was based solely on Padillagomez's maximum exposure for the determinate component of his sentence. But due to the multiple victim allegations, Padillagomez was looking at 15 years to life as to each victim, which is why counsel recommended he take a plea deal in the 17- to 20-year range.[3]

Ultimately, Padillagomez told the trial court he was not interested in taking a plea deal because, in his mind, he was not guilty of the charged offenses. Therefore, even if the prosecution's offer were still on the table, he would not accept it.

The trial court informed Padillagomez that was his choice, but based on the record before it, he had not presented grounds for a new attorney. The court therefore denied his *Marsden* motion.

---

[3] Padillagomez originally was charged with multiple counts of aggravated kidnapping and aggravated sexual assault, which also carried life terms. As the trial court explained to him, however, those charges were dropped before his trial started. So, the only way Padillagomez could get a life term was if the jury found the multiple victim allegations true.

B. *Applicable Law and Standard of Review*

"'When a defendant seeks substitution of appointed counsel pursuant to [*Marsden, supra*, 2 Cal.3d 118] "the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance. A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result."' [Citation.] We review a trial court's denial of a *Marsden* motion for abuse of discretion. [Citation.] 'Denial is not an abuse of discretion "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel."'" (*People v. Ng* (2022) 13 Cal.5th 448, 500.)

In assessing Padillagomez's *Marsden* claim, we must also keep in mind "'[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'" (*In re Andrews* (2002) 28 Cal.4th 1234, 1253–1254.) In alleging ineffective assistance of counsel, the defendant must overcome the strong presumption that counsel's performance falls within the wide range of reasonable professional conduct. (*Ibid.*)

C. *Analysis*

In arguing the trial court abused its discretion in denying his *Marsden* motions, Padillagomez renews his claims that his attorney did not do an adequate job of communicating with him, working up his case, or implementing an effective trial strategy. He also claims his attorney was somehow to blame for his "foolish" decision not to accept the prosecution's 20-year plea offer.

25

Although Padillagomez may have construed counsel's adamant (and sometimes uncivil) advice on the plea offer and other matters as evidence counsel did not believe in his case and was not working hard for him, counsel told the court his frustration with Padillagomez was rooted in his concern that Padillagomez was making decisions that would hurt him at trial. The fact Padillagomez lacked trust in counsel, had trouble dealing with him at times, and disagreed with some of his trial tactics is not grounds for a new attorney. (See *People v. Jackson* (2009) 45 Cal.4th 662, 688 [defense counsel is ""'"captain of the ship"'"" when it comes to trial strategy]; *People v. Hines* (1997) 15 Cal.4th 997, 1026 [counsel's representations defeated the defendant's claim that their alleged communication problems were insoluble and evinced an irreconcilable conflict that was likely to lead to ineffective representation].)

Furthermore, the record is clear Padillagomez rejected the plea offer *against* the advice of his attorney. Padillagomez suggests his decision stemmed from counsel's failure to inform him that, if convicted, he could be sentenced to a life term. But even after that risk was explained to him by the trial court, Padillagomez insisted—as was his right—on going to trial.

Padillagomez also claims his attorney was ineffective for not presenting certain evidence on his behalf. For example, Padillagomez contends his attorney should have introduced sexually-oriented Instagram conversations he had with adult users, to prove he was an "equal opportunist" and was not using his Instagram account solely to prey on underage females. But Padillagomez testified to that effect at trial. Further proof he was soliciting sex online from both minors and adults was not likely to have swayed the jury in his favor.

As it turned out, defense counsel was able to hang the jury on several of the charges, including one that carried an indeterminate life term, and those charges were eventually dismissed. We do not believe defense counsel was ineffective or the trial court abused its discretion in denying Padillagomez's *Marsden* motions.

## DISPOSITION

The judgment is affirmed.

GOODING, J.

WE CONCUR:

SANCHEZ, ACTING P. J.

SCOTT, J.